**UNITED STATES of America, Appellee,**

v.

**Michael J. NEWMAN, Defendant, Appellant.**

**No. 91–2303.**

United States Court of Appeals, First Circuit.

Heard June 5, 1992.

Decided Dec. 31, 1992.

John A. MacFadyen, Providence, RI, for appellant.

Craig N. Moore, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, RI, was on brief, for appellee.

Before CYR, Circuit Judge, RONEY,* Senior Circuit Judge, and PIERAS,** District Judge.

CYR, Circuit Judge.

Michael J. Newman appeals his conviction and sentence on one count of depriving a pretrial detainee of his civil rights under color of law in violation of 18 U.S.C. § 242. We affirm.

I

BACKGROUND

Viewed in the light most favorable to the verdict, *see United States v. Batista–Polanco,* 927 F.2d 14, 17 (1st Cir.1991), the evidence presented at trial warranted the following jury findings. On October 6, 1990, Daniel Peterson was arrested in Providence, Rhode Island, for drinking in public. A record check revealed outstanding warrants against Peterson. Appellant Michael J. Newman was the officer in charge of the cell block where Peterson was detained.

After being placed in a cell, Peterson began to yell and scream, then picked up the porcelain toilet in the cell and hurled it through the bars. Appellant Newman and another officer removed Peterson to a nearby cell. Peterson put up mild resistance and his wrists were handcuffed to the cell bars. Shortly after the officers left, Peterson resumed his yelling and screaming, which prompted appellant Newman to return to the cell. While still handcuffed to the cell bars, Peterson was beaten and kicked in the stomach and head by appellant. Peterson sustained injuries to his face, nose, eyes, and inner ear, and experienced difficulty in breathing. He remained in a local hospital for a week, where he experienced dizziness, severe headaches, and other physical pain. Extensive medical tests proved negative.

Newman was indicted, tried, and convicted for interfering with Peterson's civil rights under color of law, and sentenced to sixty months in prison and a two-year term of supervised release.

II

DISCUSSION

Appellant presents four claims. First, he claims that the court committed error by excluding certain "habit" evidence proffered under Federal Rule of Evidence 406. Second, he contends that he was entitled to a new trial due to juror inattentiveness. Third, he disputes the finding that the alleged assault involved "serious bodily injury." Finally, Newman attempts for the first time to assert that the sentence imposed pursuant to U.S.S.G. §§ 2A2.2(b)(3)(B) and 2H1.4(a)(2) had the impermissible effect of "double counting" any "serious bodily injury" inflicted on Peterson.

A. *Evidence Rule 406*

At trial, the defense attempted to introduce Providence Police Sergeant Mac-Donald's testimony that he had seen be-

* Of the Eleventh Circuit, sitting by designation.
** Of the District of Puerto Rico, sitting by designation.

tween 75 and 100 prisoners handcuffed to the cell bars, but never to the first bar. MacDonald's testimony was offered to support Newman's testimony that he had handcuffed Peterson to the third bar of the cell and not to the first bar as Peterson testified. The issue became material in light of the trial testimony of Daniel Greene, a detainee in the same cell block, who claimed to have seen Peterson's cuffed hands protruding through the bars during the assault. The evidence demonstrated that Greene could have seen Peterson's hands only if they were cuffed to the first bar. The district court sustained the government's objection to the proffered testimony.

█ Under Rule 406, competent evidence of a person's "habit" may be admissible to prove conduct in conformity with the habit on a particular occasion. *Reyes v. Missouri P.R. Co.,* 589 F.2d 791, 794 (5th Cir.1979); *see also* John H. Strong, *McCormick on Evidence* § 195 (4th ed. 1992); 1A John A. Wigmore, *Evidence* § 95 (Tillers rev. 1983).[1] The party offering the evidence must establish the habitual nature of the alleged practice. *Weil v. Seltzer,* 873 F.2d 1453, 1461 (D.C.Cir.1989). As with other exclusionary rulings, the party challenging an exclusion of habit evidence under Rule 406 bears the heavy burden of demonstrating on appeal that the trial court abused its discretion. *McWhorter v. Birmingham,* 906 F.2d 674, 675 (11th Cir. 1990); *Rosenburg v. Lincoln American Life Ins. Co.,* 883 F.2d 1328, 1337 (7th Cir.1989); *Weil,* 873 F.2d at 1460; *United States v. Troutman,* 814 F.2d 1428, 1454 (10th Cir.1987); *see also United States v. McCarthy,* 961 F.2d 972, 977 (1st Cir.1992) (we review rulings on the admissibility of evidence for "abuse of discretion").

█ Habit evidence under Rule 406 may be probative of " 'the regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn....' " Fed.R.Evid. 406, advisory committee's note (quoting McCormick, *Evidence* § 195 at 826); *Loughan v. Firestone Tire & Rubber Co.,* 749 F.2d 1519, 1524 (11th Cir.1985). Although there are no "precise standards" for determining whether a behavior pattern has matured into a habit, two factors are considered controlling as a rule: "adequacy of sampling and uniformity of response." Fed.R.Evid. 406, advisory committee's notes; *McWhorter,* 906 F.2d at 679; *G.M. Brod & Co. v. U.S. Home Corp.,* 759 F.2d 1526, 1533 (11th Cir.1985); *Loughan,* 749 F.2d at 1529; *Weil,* 873 F.2d at 1460; *Reyes,* 589 F.2d at 795. These factors focus on whether the behavior at issue "occurred with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances." *Weil,* 873 F.2d at 1460. The requisite regularity is tested by the " 'ratio of reaction to situations.' " *Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494, 512 (4th Cir.1977) (quoting Lewan, *Rationale of Habit Evidence,* 16 Syracuse L.Rev. 39, 51 (1964)), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978); *Weil,* 873 F.2d at 1461; *Simplex, Inc. v. Diversified Energy Systems, Inc.,* 847 F.2d 1290, 1294 (7th Cir.1988). It is essential, therefore, that the regularity of the conduct alleged to be habitual rest on an analysis of instances " 'numerous enough to [support] an inference of systematic conduct' and to establish 'one's regular response to a repeated specific situation.' " *Wilson,* 561 F.2d at 511 (quoting Fed.R.Evid. 406, advisory committee's notes).

█ Appellant's proffer failed to demonstrate the admissibility of the MacDonald testimony under Rule 406. Appellant provided no foundation for assessing the adequacy of the sampling to which MacDonald would testify. There was no evidence even approximating the number of times prison-

---

1. Evidence Rule 406 states:
   Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.
   Fed.R.Evid. 406.

ers were handcuffed to the cell bars.[2] Absent some evidence of the number of instances in which the handcuffing practice took place, we cannot conclude that the district court abused its discretion. An officer's observation of 75 to 100 such instances did not *require* the conclusion that the putative practice was followed with the necessary regularity. *See Brod,* 759 F.2d at 1533 (testimony concerning specific instances within experience of witness, when considered in light of thousands of unobserved similar instances, "falls far short of the adequacy of sampling and uniformity of response which are the controlling considerations governing admissibility").

Other considerations reinforce the conclusion that the district court did not abuse its discretion. First, Sergeant MacDonald testified that there was no "rule or practice that's followed" about where to handcuff prisoners but that "[t]he officers involved ... at the time would decide where to handcuff them and how to do it." Second, we are aware of no case, and appellant cites none, in which the routine practice of an organization, without more, has been considered probative of the conduct of a particular individual within the organization. *See United States v. Angelilli,* 660 F.2d 23, 41 (2d Cir.1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449, *cert. denied,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982) (questioning whether it is proper on the basis of the "ambiguous structure of Rule 406" to infer individual behavior based on evidence of routine practice of the organization). The exclusionary ruling under Evidence Rule 406 did not constitute error.

## B. *Juror Inattentiveness*

Appellant contends that the district court (1) failed to conduct adequate inquiry into allegations that one or more jurors slept during portions of the trial, and (2) committed reversible error by denying a new trial based on the alleged juror inattentiveness.

At one point during trial, on July 10, the presiding judge observed a juror who appeared as though he may have been asleep.[3] Immediately, the judge advised all counsel and offered to replace the juror with an alternate. Defense counsel declined the offer. The judge promptly and firmly cautioned all members of the jury on the importance of devoting full attention to the evidence. After trial, three putative eyewitnesses submitted letters recounting their observations of one or more jurors who appeared to be sleeping during parts of the trial.[4]

These letters formed the basis for appellant's motion for new trial. The district court stated that it had "noted the incidents in question and promptly brought it to the attention of counsel in a[n] [unrecorded] bench conference," but that defense counsel rejected the court's offer to

---

2. The district court nonetheless allowed appellant to testify that he and other officers "always cuffed prisoners" to the third bar.

3. The presiding judge described the related events as follows:

> [D]uring the trial I called counsel to the bench; as I recall, I told them that I had observed a juror with his eyes closed and that the juror may have been sleeping. I did not say the juror was sleeping, nor can it be said that he was. I did not see any jurors' head fall 'to the side' with his chin 'on his chest' as described by one of the letter writers. Both the prosecutor and the defense counsel acknowledged they too had noticed what I observed. I offered to excuse the juror and have him replaced with an alternate. In no uncertain terms, defense counsel objected.

4. Each of the three letters describes one juror who appeared to be asleep. Two of the letters refer to July 10 and appear to refer to the same juror and the same incident. According to one letter, a juror in the back row slept for ten minutes during the testimony of Dr. Welch. The second letter refers to a juror in the back row who rested his head on the wall and appeared to have his eyes closed for about ten minutes, but the letter does not indicate what was transpiring in the trial at the time. The third letter appears to refer to another juror at another time. It describes a juror in the front row who slept through most of the testimony of Dr. Green and when he awoke asked another juror: "What did he say?" The letter states that this juror slept during the testimony of a police officer and on and off during the testimony of all three doctors. Although the letter does not indicate the date on which these observations were made, the witnesses to which it refers testified on July 9 and July 10.

replace the juror.[5] The court noted further that there was no firm evidence that the juror had been asleep. The court offered to submit to an interrogation on the record by defense counsel as to its recollection of the incidents, which was confirmed by the prosecutor. The proposal was not endorsed by defense counsel. Defense counsel requested neither further investigation, nor an evidentiary hearing, into the allegations contained in the letters submitted after trial. The district court determined that any inattentiveness which may have occurred was limited to "an isolated moment" in a week-long trial, thus implicitly determining that there had been no prejudice to appellant. The motion for new trial was denied.

Appellant belatedly challenges the adequacy of the district court's investigation into the letter allegations of juror inattentiveness. The gravamen of the unpreserved claim is that the three letters allege juror inattentiveness on more than one day and *apparently* by more than one juror, whereas the district court merely addressed the inattentiveness of one juror, on July 10. According to appellant, the failure to investigate these letter allegations rendered it impossible to determine whether he was deprived of a fair trial.

■ The "district court has broad discretion to determine the type of investigation which must be mounted[ ]" in response to an allegation of juror misconduct. *United States v. Boylan*, 898 F.2d 230, 258 (1st Cir.), *cert. denied*, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). An evidentiary hearing is not invariably required. *Id.* (citing cases). Rather, it is the responsibility of the trial court "to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial." *Id.; United States*

*v. Hunnewell*, 891 F.2d 955, 961 (1st Cir. 1989). A determination that no juror misconduct occurred will be overturned only on a showing that the trial court committed a "patent abuse of discretion." *Id.* Similarly, the denial of a motion for new trial is reviewed for abuse of discretion. *United States v. Soto–Alvarez*, 958 F.2d 473, 475 (1st Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 221, 121 L.Ed.2d 159 (1992); *United States v. Dockray*, 943 F.2d 152, 157 (1st Cir.1991).

■ We find no abuse of discretion in the district court's handling of the allegations of juror inattentiveness, *see Boylan*, 898 F.2d at 258 ("district court has discretion to determine the type of investigation which must be mounted"), or in its denial of the motion for new trial. First, defense counsel neither requested an evidentiary hearing nor an investigation into the vague and conclusory allegations contained in the three letters. Indeed, the presiding judge viewed the belated allegations as "a disingenuous attempt to set aside the jury verdict." After considering the allegations, the court concluded that the "incidents" in question had been dealt with adequately by the earlier offer, at the unrecorded bench conference on July 10, to replace an inattentive juror, and by the instruction reminding all jurors of their duty to remain attentive.

Insofar as the court correctly treated the incidents collectively recounted in the three letters to have been considered and dealt with at the unrecorded bench conference on July 10, appellant was entitled to no further relief. Notwithstanding the court's invitation, appellant chose not to challenge the judge's description as to what transpired at the unrecorded July 10 bench conference,[6] and opposed replacement of

---

5. The district court noted in its memorandum order that defense counsel vigorously opposed replacement of the inattentive juror, as a denial of defendant's "right to have his case heard by a juror of [his] choice."

6. In denying the motion for new trial, the district court noted that "[t]he absence of a record forces me to note my personal recollection, which varies from the aforementioned letters but is corroborated by the prosecutor. I feel it is unfair to have my unrecorded statement go to the appellate court without affording counsel an opportunity to question it. The defendant's lawyer is very experienced and sophisticated and, I am sure, not awed by any court. If he wishes, I am perfectly willing to have him interrogate me on the record, in chambers, and attach a transcript of our meeting as part of this Memorandum."

the inattentive juror. Appellant will not now be heard for the first time to challenge the district court's determination that the entire matter was dealt with during the unrecorded July 10 bench conference. *See United States v. Kimberlin*, 805 F.2d 210, 244 (7th Cir.1986), *cert. denied*, 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987) (no error where court brought to attention of counsel that a juror appeared to be sleeping, but neither side requested juror replacement). On the other hand, insofar as appellant may have believed that the three letters collectively recounted one or more other instances of juror inattentiveness not dealt with at the unrecorded bench conference, he not only failed to avail himself of the opportunity to test the contrary recollection recorded by the court but requested neither further investigation nor an evidentiary hearing, insisting instead upon a new trial as the only acceptable remedy. *Cf. United States v. Schnabel*, 939 F.2d 197, 201 (4th Cir.1991) (no prejudicial error in court's refusal to grant supplementary voir dire where defendant declined court's offer to excuse juror.)

The district court did not abuse its discretion in concluding that no prejudicial juror misconduct occurred.

### C. *U.S.S.G. § 2H1.4(a)(2)*

#### 1. "Serious Bodily Injury"

Section 2H1.4(a)(2) provides that the base offense level for interference with civil rights under color of law is to be set six levels above the base offense level for the underlying offense. At sentencing, the district court determined that the underlying offense was an aggravated assault, as it involved "serious bodily injury." *See* U.S.S.G. § 2A2.2, comment. (n. 1). Thus, the base offense level was set at 21, then adjusted upward four more levels, pursuant to U.S.S.G. § 2A2.2(b)(3)(B), because the victim suffered "serious bodily injury," which yielded a total offense level of 25.

At the outset, appellant challenges the district court finding that Peterson suffered "serious bodily injury," which he claims led the court into reversible error both in its determination that the underlying offense constituted an aggravated assault and in its further four-level upward adjustment for causing "serious bodily injury."

First, we must determine the appropriate standard of review. The parties agree that whether the assault involved "serious bodily injury" presents a mixed question of law and fact. In light of their concession and because the pivotal question addressed by the sentencing court—whether the victim's injuries were sufficiently extensive to constitute "serious bodily injury"—called for a fact dominated evaluative judgment, in the present case we review for "clear error." *Cf., e.g., United States v. Pilgrim Market Corp.*, 944 F.2d 14, 17 (1st Cir.1991) (concluding that 18 U.S.C. § 3742(e) and First Circuit precedent require "clear error" review of the mixed question of law and fact relating to the grouping of counts, even though other circuits would conduct *de novo* review).[7] Under a "clear error" standard of

---

**7.** "Plain error" may even be the appropriate standard of review in the present case. Although the issue of "serious bodily injury" was contested in the district court, appellant inconsistently conceded that "the base level of 21 obviously is appropriate." A base offense level of 21 would be appropriate in the present case only if the assault was "aggravated," rather than "minor." Moreover, since there is no contention that the offense involved either a dangerous weapon or intent to commit another felony, it could be determined an aggravated assault only if it involved "serious bodily injury." *Compare* U.S.S.G. § 2A2.2, comment. (n. 1) ("'Aggravated assault' means a felonious assault that involved (a) a dangerous weapon with intent to do bodily harm ..., or (b) serious bodily injury, or (c) an intent to commit another felony.") *with* U.S.S.G. § 2A2.3, comment. (n. 1) ("'Minor assault' means a ... felonious assault not covered by § 2A2.2"). Since the adjusted base offense level of 21 was not challenged below, ordinarily we would review the finding of "serious bodily injury" only for "plain error" insofar as it served as a predicate for the determination that the underlying offense constituted an "aggravated assault." *See United States v. Bello–Perez*, 977 F.2d 664, 673 (1st Cir.1992) (application of guideline to specific facts reviewed only for "plain error" unless raised below); *United States v. Morales–Diaz*, 925 F.2d 535, 540 (1st Cir.1991) (same). The issue is of no practical consequence in the present case, however, as we discern neither "clear" nor "plain" error.

review, "where more than one reasonable inference may be drawn from undisputed facts, 'the sentencing court's choice among supportable alternatives cannot be clearly erroneous.'" *United States v. Preakos*, 907 F.2d 7, 8 (1st Cir.1990) (quoting *United States v. Ruiz*, 905 F.2d 499, 508 (1st Cir. 1990)); *see also United States v. McLaughlin*, 957 F.2d 12, 17 (1st Cir.1992).

The Sentencing Guidelines define "serious bodily injury" as "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, comment. (n. 1)(j). The sentencing court supportably found that Peterson sustained injury to his inner ear. The ear is "the organ of hearing and equilibrium," which includes "a fluid-filled internal ear that maintains balance and that conducts the tympanic vibrations to the auditory nerve, which transmits them as impulses to the brain." *Random House*, Unabridged (2d ed. 1987), at 613. Medical testimony was presented that upon entering the hospital Peterson complained of dizziness and tinnitus. While tests were "unrevealing," the examining neurosurgeon testified that it was "not unusual" for inner ear damage to be evidenced solely by the patient's "subjective complaints." Moreover, Peterson was hospitalized for six days as a result of the beating administered to his head, which caused severe headaches, facial bruising and hemorrhaging around the eyes and under the scalp, in addition to the inner ear injury. *See* U.S.S.G. § 1B1.1, comment. (n. 1)(j) (defining "serious bodily injury" as "injury involving extreme physical pain" *or* "impairment of a bodily ... organ ...," *or* "requiring ... hospitalization...."").

We discern no clear error in the finding that the assault caused "serious bodily injury."

### 2. "Double Counting"

Finally, Newman claims for the first time that the district court engaged in impermissible "double counting," as the four level increase in the base offense level, *see*

U.S.S.G. § 2A2.2(b)(3)(B), was predicated on the same finding of "serious bodily injury" that prompted the fifteen level adjustment in the base offense level for the underlying offense, *see id.* § 2H1.4(a)(2), "aggravated assault," *see id.* § 2A2.2(a).

As the "double counting" claim was not raised below, we consider whether it may be raised on appeal. Although pure issues of law may be raised for the first time on appeal in "exceptional cases," normally we will entertain an unpreserved legal claim only if the failure to do so would result in a "rank miscarriage of justice." *See United States v. La Guardia*, 902 F.2d 1010, 1012–13 (1st Cir.1990) (listing factors); *United States v. Krynicki*, 689 F.2d 289, 291–92 (1st Cir.1982) (same).

The district court sentenced defendant to 60 months in prison. Were it not for the challenged four level increase in appellant's base offense level under U.S.S.G. § 2A2.2(b)(3)(B), which yielded a 57–to–71 month GSR, the total adjusted offense level would have been 21, yielding a 37–to–46 month GSR. Assuming the challenged four level increase was impermissible, yet not reviewable on appeal, Newman would be compelled to serve no less than fourteen months longer than the maximum sentence allowable under the appropriate GSR. We are persuaded, therefore, that the requisite showing has been made for discretionary review of appellant's unpreserved claim.

After supportably finding that the assault caused "serious bodily injury," the sentencing court calculated appellant's base offense level in exact accordance with the plain language of the applicable sentencing guidelines. Pursuant to U.S.S.G. § 2H1.4(a)(2), the court set the base offense level at 21—six levels above the base offense level of 15 for the underlying offense of "aggravated assault," *see* U.S.S.G. § 2A2.2(b) ("a felonious assault that involved ... (b) serious bodily injury")—then increased it four levels, pursuant to U.S.S.G. § 2A2.2(b)(3)(B), because the victim sustained "serious bodily injury." Thus, the first hurdle appellant must over-

come is that the applicable sentencing guidelines expressly mandate the "double counting" challenged on appeal.[8]

■■■■ As with statutory language, *see, e.g., North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983); *Benoni v. Boston & Maine Corp.,* 828 F.2d 52, 57 (1st Cir.1987), we think the plain and unambiguous language of a sentencing guideline affords the best recourse for its proper interpretation, *cf. United States v. Williams,* 954 F.2d 204, 206 (4th Cir.1992) ("double counting" required since Sentencing Guidelines "must be applied as written"); *United States v. Florentino,* 922 F.2d 1443, 1446 (10th Cir. 1990) ("double counting" permissible where "clear and unambiguous" guideline language indicates Commission so intended) (applying § 2L1.1 adjustment for prior conviction already reflected in criminal history category). Furthermore, the district court's application of U.S.S.G. § 2A2.2(b)(3)(B) accords with the apparent intent of the Sentencing Commission as evidenced not only by the plain and unambiguous guideline language but by other intrinsic considerations as well. For example, the Commission's awareness of the sentencing excesses which flow from *impermissible* "double counting" is plainly reflected in other guideline application notes expressly forbidding it. *See, e.g.,* U.S.S.G. § 3A1.1 comment. (n. 2) (no "victim related" adjustment when *offense* guideline specifically incorporates same § 3A1.1 factor); § 3A1.2 comment. (n. 3) (same); § 3A1.3 comment. (n. 2) (same); *cf.* § 3D1.2 comment. (n. 5) (application note governing grouping of closely related counts "prevents double counting of *offense* behavior.") (emphasis added). "Under the principle of *expressio unius est exclusio alterius,* the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." *United States v. Rocha,* 916 F.2d 219, 243 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991) (citing *United States v. Vickers,* 891 F.2d 86, 88 (5th Cir.1989) ("double counting" for ransom demand pursuant to § 2A4.1(b)(1) and for extortion pursuant to § 2A4.1(b)(5) not improper)); *United States v. Curtis,* 934 F.2d 553, 555 (4th Cir.1991) ("double counting" for more than minimal planning under § 2B1.1(b)(4) and as organizer and manager under § 3B1.1(c) not improper); *see also United States v. Goolsby,* 908 F.2d 861, 863 (11th Cir.1990) (refusing "to fashion an exception [to "double counting"] since the Commission has demonstrated its ability to do so in those areas it has deemed an exception to be appropriate") (crime of escape considered under both § 4A1.1(d) and § 2P1.1(a)(1)). *Cf. United States v. McInnis,* 976 F.2d 1226, 1233–35 (9th Cir.1992) (applying § 2H1.3(a)(2), (3) where "underlying offense" was deemed an aggravated assault per § 2A2.2(b)(3)(B)) ("double counting" not addressed; *but cf. United States v. Hudson,* 972 F.2d 504, 507 (2d Cir.1992) (it is not the law in the Second Circuit that "double counting is always permissible, except when explicitly forbidden by the Guidelines") (citing cases); *United States v. Romano,* 970 F.2d 164, 167 (6th Cir.1992) (defendant should not be penalized for same conduct under two different guideline provisions "whether or not the Guidelines expressly prohibit" doing so); *United States v. Werlinger,* 894 F.2d 1015, 1017 (8th Cir.1990) (rule of lenity requires that Guidelines not be readily construed to multiply punishment of conduct already punished through the application of another guideline provision); *United States v. Adeleke,* 968 F.2d 1159, 1161 (11th Cir.

---

8. Although no appellate court has yet considered this particular "double counting" issue, there is a divergence between the two courts of appeals which have addressed the closely analogous question whether a defendant's base offense level can be increased pursuant to U.S.S.G. § 2A2.2(b)(2)(A) for using a *dangerous weapon,* notwithstanding that the same factor formed the predicate for finding the underlying offense an aggravated assault, *see* U.S.S.G. § 2A2.2(a), comment. (n. 1) (" 'aggravated assault' means a felonious assault that involved (a) a dangerous weapon with intent to do bodily harm ..."). *See United States v. Williams,* 954 F.2d 204, 206–08 (4th Cir.1992) ("double counting" required); *but see United States v. Hudson,* 972 F.2d 504, 506–07 (2d Cir.1992) (expressly disagreeing with *Williams* ).

1992) ("double counting" proper "if the Sentencing Commission intended the result, *and* if the result is permissible because 'each section concerns conceptually separate notions relating to sentencing' ") (quoting *United States v. Aimufua*, 935 F.2d 1199, 1201 (11th Cir.1991)) (emphasis added).

Closer to home, U.S.S.G. § 2H1.4 itself reflects that it was drafted with the excesses of impermissible "double counting" clearly in mind. In prescribing that the base offense level for interfering with civil rights under color of law is to be the greater of level 10, or 6 levels above that of the underlying offense (here, aggravated assault), the guideline application note to U.S.S.G. § 2H1.4 first directs the sentencing court to the section 2H1.1 commentary, U.S.S.G. § 2H1.4, comment. (n. 1), then mandates: "Do not apply the adjustment from § 3B1.3 (Abuse of Position of Trust or Use of Special Skill)," *id.* § 2H1.4, comment. (n. 2), "because the base offense level in § 2H1.4(a) reflects that the abuse of actual or purported legal authority is *inherent* in the offense," *id.* § 2H1.4, comment. (backg'd.) (emphasis added). By way of contrast, section 2H1.4 gives no indication whatever that the offense level should not be increased where the person who is deprived of his civil rights under color of law sustains bodily injury, as in the present case. We believe the reason is clear: bodily injury is *not* an inherent characteristic of the offense of interfering with civil rights under color of law.

Moreover, the immediately preceding guideline, U.S.S.G. § 2H1.3 (Use of Force or Threat of Force to Deny Benefits or Rights in Furtherance of Discrimination: Damage to Religious Real Property), represents a deliberate Commission determination to increase the base offense level for a civil rights violation *if* the defendant inflicts bodily injury on the victim. Section 2H1.3 prescribes alternative base offense level increases depending on whether the victim sustained injury. *Id.* § 2H1.3(a)(1), (2) (increase by 10 if no injury occurred; by 15 if injury occurred). The section 2H1.3 commentary, appearing a scant four lines above section 2H1.4 (Interference with Civ-

il Rights Under Color of Law), explains: *"The base offense level in § 2H1.3(a) reflects that the threat or use of force is inherent in the offense."* U.S.S.G. § 2H1.3 comment. (backg'd.) (emphasis added); to which we would add, simply: unlike the offense of interfering with civil rights under color of law, *see id.,* § 2H1.4, which involves *neither* bodily injury *nor* the threatened or actual use of force as an *inherent* offense characteristic.

Finally, applying these sentencing guidelines in accordance with their plain and unambiguous language promotes proportionality in sentencing, an important congressional objective of guideline sentencing. U.S.S.G., Ch. 1, Pt. A, intro. 2, p.s. (Congress sought "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity"). U.S.S.G. § 2A2.2(b)(3) prescribes incremental sentence adjustments scaled to the severity of the bodily injury inflicted on the victim. For example, while "serious bodily injury" requires a four level increase, "permanent or life-threatening bodily injury" necessitates a six level increase. U.S.S.G. § 2A2.2(b)(3)(B–C). If we were to conclude, as appellant urges, that impermissible "double counting" resulted from the four level increase for "serious bodily injury," no increase in the offense level would be permissible even for the more egregious infliction of "permanent or life-threatening bodily injury," *see id.* § 2A2.2(b)(3)(D), where the assault likewise was determined to have been aggravated in light of the degree of bodily injury sustained by the victim, *see id.* § 2H1.4(a)(2). The carefully calibrated offense level adjustment scheme prescribed in U.S.S.G. § 2A2.2(b)(3), *cf. Williams*, 954 F.2d at 206 (§ 2A2.2(b)(2) "rationally reflects the Guideline's graduated adjustment scheme" for possessing a weapon), would be disarranged in such cases, as the base offense level could not be increased either in response to an assault which caused "permanent or life-threatening injury," U.S.S.G. § 2A2.2(b)(3)(D), or one which caused "seri-

ous bodily injury," U.S.S.G. § 2A2.2(b)(3)(C).

Thus, in sum, we think the carefully structured sentencing scheme in Chapter Two, Part H, *as a whole*, no less than U.S.S.G. § 2H1.4 in particular, constitutes a considered *resolution* of the "double counting" issue raised on appeal, rather than evidence of the Commission's failure to recognize it. As there was no impermissible "double counting," we reject the contention that the district court was required to disregard the plain and unambiguous language of U.S.S.G. §§ 2A2.2(b)(3)(B) and 2H1.4(a)(2).

For the foregoing reasons, the sentence imposed by the district court must be affirmed.

*Affirmed.*