USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 95-1835 UNITED STATES OF AMERICA, Plaintiff, Appellee, v. TAD A. PAGE, Defendant, Appellant. _____________________ No. 95-1836 UNITED STATES OF AMERICA, Plaintiff, Appellee, v. ALLEN J. ADAMS, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Aldrich, Senior Circuit Judge, ____________________ and Selya, Circuit Judge. _____________ ____________________ ____________________ R. Scott Miller, Jr., by appointment of the Court, for Allen J. _____________________ Adams. Peter Clifford, by appointment of the Court, for Tad A. Page. ______________ Rebecca K. Troth with whom Jessica Dunsay Silver, Deval L. __________________ _______________________ _________ Patrick, Assistant Attorney General, Jay P. McCloskey, United States _______ _________________ _____________ Attorney, and John S. Gleason III, Assistant United States Attorney, ________ ____________________ were on brief for appellee. ____________________ May 24, 1996 ____________________ ALDRICH, Senior Circuit Judge. Defendants Allen _____________________ Adams and Tad Page pled guilty to three counts of conspiracy and interference with the civil rights of others in September of 1992. They now object to virtually every step of the court's application of the Sentencing Guidelines and underlying statutes to their offenses. We affirm. According to pre-sentence reports accepted by the court, in the early hours of September 19, 1992, Adams accosted Ruben Gonzales, Oscar Luna and Emiliano Valenzuela as they attempted to enter a convenience store, calling them "f______ Mexicans" who should go back to Mexico where they "belonged," and offering to send them back in a body bag. Page joined Adams, who grabbed Page's handgun from inside his truck, stuck it to Gonzales' temple and threatened to "blow his head off." An employee called the police, whereupon Gonzales and his companions drove off with a fourth friend who had remained in their car. Page jumped in his truck and followed, with Adams in the passenger seat and the gun between them, and two cohorts riding in back. Two other carloads of their friends joined the chase. Driving about 75 miles an hour, Page pulled up behind Gonzales' car, fired seven shots into the air, and at Adams' urging, two more directly into the back of the vehicle and two at the ground behind it. One bullet struck Luna in the arm, another lodged in the headrest behind Gonzales' head. Page then slowed and -3- turned back. Luna was taken to a hospital shortly, treated for a gunshot wound to his right upper arm and released approximately 90 minutes later. He lost use of his arm and was unable to work for three weeks, and continued to suffer residual pain for some time. Pursuant to a plea agreement, Adams and Page each pled guilty to conspiracy to hinder others in the free exercise of federally secured rights, in violation of 18 U.S.C. 241 (count I), racially motivated interference with Gonzales' use of a public accommodation, in violation of 18 U.S.C. 245(b)(2)(F) and 2 (count II), and interference with Luna's use of same, in violation of 18 U.S.C. 245(b)(4)(A) and 2 (count IV). In return, the government dismissed the remaining counts charging interference with the rights of the two other men, and use of a firearm in connection with a crime of violence. Defendants were sentenced July 21, 1995. The court made the same sentencing calculations for both defendants, to which neither objected. Applying USSG 2H1.3(a)(3),1 the court determined that the underlying offense for both counts II and IV was "aggravated assault," having determined that both involved use of "a dangerous weapon with intent to do bodily harm." See 2A2.2 and comment. (n.1). Allowing ___  ____________________ 1. Section 2H1.3 has been deleted by consolidation with 2H1.1, effective Nov. 1, 1995, but was still operative at the time of defendants' sentencing. -4- enhancements for Luna's injury, 2A2.2(b)(3)(B), discharge of a firearm, 2A2.2(b)(2)(A), and obstruction of justice, 3C1.1, it arrived at a combined offense level of 30, deducted three for acceptance of responsibility, 3E1.1, for a total offense level of 27. Page, with no prior convictions, faced an imprisonment range of 70 to 87 months, and Adams, who has a record, faced 78 to 97 months. The court imposed 70 months on Page, and 88 on Adams, and assessed each $370 in restitution. The bulk of defendants' appeal proceeds on the mistaken notion that the aggravated assault provision, 2A2.2, applies only if the victim suffered "serious bodily injury," which they contend was not the case for either count. Serious bodily injury, however, is only one of several alternative bases for applying the aggravated assault provision: "Aggravated assault" means a felonious assault that involved (a) a dangerous weapon with intent to do bodily harm (i.e., not merely to frighten), or (b) __ serious bodily injury, or (c) intent to __ commit another felony. USSG 2A2.2, comment. (n.1). (Emphasis added.) Thus simple intent to do bodily harm of any kind, without regard to the degree actually suffered, if any,2 may support a finding of  ____________________ 2. Under 2A2.2, degree of bodily injury is relevant only to determining how many levels to add -- two for "bodily injury," four for "serious bodily injury," and three for something in between. See 2A2.2(b)(3). Defendants also ___ -5- aggravated assault and application of the far heftier base offense level and enhancements than provided for under the "minor assault" guideline that defendants would prefer the court to apply. The court unassailably found that firing multiple gunshots at an occupied and moving vehicle "is bound to result in hitting a tire, gas tank, person, something that can only be calculated to end up in bodily harm," and therefore that both counts II and IV fit the aggravated assault guideline. Defendants' effort to void this finding by pointing out that the bullet that actually struck Luna was one that had been aimed at the ground, and simply ricocheted upward into the vehicle, does not advance their claim. Neither the court nor the parties focussed, however, on 2A2.2's additional requirement that the assault be "felonious." The argument that count II, resulting in no injury to Gonzales, is not "felonious" for the purpose of applying 2A2.2 was not specifically articulated to the district court. Because we find it was at least implicitly raised and pursued by defendants' multiple efforts to attack the propriety of applying 2A2.2 to count II, and the government addressed the issue without contending review was foreclosed, we reach it despite perhaps imperfect  ____________________ dispute the court's addition of four levels under this provision, which we address post. ____ -6- preservation below.3 Our first question is, quite simply, what does the guideline mean by "felonious?" Although commentary to 2A2.2 defines a host of terms and phrases, no definition for felony or "felonious" is provided or referenced. Prior to enactment of the Guidelines a felony had long been defined as "any offense punishable by death or imprisonment for a term exceeding one year." 18 U.S.C. 1 (June 25, 1948), repealed ________ by Sentencing Reform Act of 1984, Pub.L. 98-473, Title II, __ 218(1)(1), 98 Stat. 2027 (repeal effective Nov. 1, 1987). The Guidelines perhaps obviated the necessity of 1, but nowhere refute or replace its felony definition. In fact, a provision unrelated to 2A2.2 defines a felony precisely according to the repealed statute. See USSG 4A1.2(o). An ___ intent to incorporate this pre-existing definition into the Guidelines where appropriate thus seems clear. We conclude, therefore, that "felonious," as used in 2A2.2, means "punishable by death or a term of imprisonment exceeding one year." The penalty provision of 245(b) in force at the  ____________________ 3. We note that if count II cannot be considered an aggravated assault, defendants' combined offense level would be no more than 25, yielding a guideline range of 57-71 months for Page, and 63-78 for Adams, permitting sentences of up to 13 and 15 months less than they received, respectively. Cf. United States v. Newman, 982 F.2d 665, 672 (1st Cir. ___ _____________ ______ 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 59, 126 L.Ed.2d ____________ 28 (1993). -7- time of the assaults provided that offenders shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life. -8- 18 U.S.C. 245(b) (amended Sept. 13, 1994). Count II is _______ therefore felonious only if it resulted in bodily injury.4 Gonzales himself suffered none, thus count II qualifies only if Luna's gunshot wound can be said to have resulted from defendants' violation of Gonzales' rights as well as Luna's. According to defendants, the problem with this is two-fold: it unjustifiably stretches the language of 245(b) and, because Luna's injury already sustains increase in the applicable punishment for count IV, runs afoul of the prohibition on multiple punishments contained in the double jeopardy clause of the Constitution. We find nothing in the statutory language to support reading the penalty provision of 245(b) to permit enhancement only in cases of bodily injury to the intended victim of the particular offense. Nor is there anything indicating an intent to restrict penalty enhancement to a single count when multiple counts aimed at several  ____________________ individuals end up causing but a single bodily injury. 4. There is no question that Luna's injury supports enhancement for count IV. First, it is plain from the structure of 245(b) that the 5. The Senate Judiciary Committee Report on the history of penalty enhancement applies to each and every listed offense the bill explained the graduated penalty provision as follows: that "results" in bodily injury, regardless of whether the If no one is actually harmed, penalties _______ victim of the particular offense was the one injured.5 are limited to a $1,000 fine and 1 year imprisonment; if bodily injury results, the maximum penalties are a $10,000 fine and 10 years imprisonment; and if death results . . .  S. Rep. No. 721, 90th Cong., 2d Sess. (Nov. 2, 1967), reprinted in 1968 U.S.C.C.A.N. 1837, 1846. (Emphasis added.) ____________ -9- Second, the unqualified phrase, "if bodily injury results," unambiguously signifies that there is no safe haven for a perpetrator of aggravated assault against many that happens to result in bodily injury only to one. Cf. United States v. ___ _____________ Bass, 404 U.S. 336, 347-48 (1971). The court found that the ____ offense behavior underlying both counts included two bullets aimed directly at the car -- that only Luna was physically injured is immaterial to the conclusion that the violations of both Luna's and Gonzales' civil rights each "resulted" in ___ the bodily injury sustained by Luna, rendering both counts subject to penalty enhancement under 245(b). Count II is therefore "felonious" for the purpose of applying USSG 2A2.2. Defendants' claim that this reading unconstitutionally subjects them to multiple punishments for the same offense is also unavailing. There is no question that the offenses in sub-sections (2)(F) and (4)(A) of 245(b), at least when committed against different individuals, describe discrete and separately punishable crimes, with higher sentences authorized for each offense resulting in bodily injury (or death). The multiple punishments prohibition of the double jeopardy clause "merely prohibits a sentencing court from imposing a stiffer punishment than the legislature intended." Catala Fonfrias _______________ v. United States, 951 F.2d 423, 425-426 (1st Cir. 1991) ______________ -10- (citing Missouri v. Hunter, 459 U.S. 359, 366 (1983)), cert. _____ denied, 506 U.S. 834 (1992). In Fonfrias, relying on both ______ ________ text and legislative history, we held that a penalty provision identical to 245(b)6 clearly contemplated that a single "result" could be the consequence of more than one covered crime, and consequently upheld imposition of two consecutive life sentences for a single death resulting from defendant's commission of two separate offenses. Id. at 426. ___ So, here, Luna's injury, the result of two separate offenses, can support penalty enhancement for each without raising double jeopardy concerns. Defendants next complain of the court's refusal to group all three counts together, which would have saved them at least a two-level increase, see 3D1.4, but we are unable ___ to discern anything out of step in the court's rote application of the grouping guideline. See USSG 3D1.2 and ___ comment. (n.5). Defendants also attack the court's finding that Luna's wound was a "serious bodily injury," which added four to the offense level for count IV. See 2A2.2(b)(3)(B). ___ Adams asserts, first, error of law in the court's use of the Guideline definition, because it does not follow Congress'  ____________________ 6. Section 245 was enacted along with the penalty enhancement revisions to 241 and 242 considered in Catala ______ Fonfrias, via the same 1968 bill. See Pub.L. 90-284, Title ________ ___ I, 101(a), Apr. 11, 1968, 82 Stat. 73. -11- language used to define crimes and set minimum or maximum sentences.7 There is no reason why the Guidelines may not make their own classifications within the statutes, and hence definitions which the courts must observe, so long as these are not internally inconsistent or in violation of the Constitution or a federal statute. See Stinson v. United ___ _______ ______ States, 508 U.S. 36, 38 (1993). We see no such problem here. ______ Second, both defendants claim clear error in the court's factual determination that a bullet wound to the upper arm which took the victim to the hospital (90 minutes) and left him work-disabled for three weeks "constitute[d] the impairment of a function of a bodily member," thereby falling within the Guideline definition of what is serious. To impair, generally, means to diminish or decrease. There is no requirement of duration, nor does the Guideline definition impose one with respect to this or any of the other examples given. See Jarecki v. G.D. Searle, 367 U.S. 303, 307 (1961) ___ _______ ___________ ("The maxim noscitur a sociis, that a word is known by the __________________  ____________________ 7. The Guidelines define "serious bodily injury" as: injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. As used in the guidelines, the definition of this term is somewhat different than that used in various statutes. USSG 1B1.1, comment. (n.1(j)). -12- company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings . . . ."). Whether impairment for a moment ranks as serious, cf. United States v. Thompson, 60 F.3d 514, 516 (8th ___ _____________ ________ Cir. 1995) (unconsciousness from assault is impairment of mental facilities), three weeks disability should be sufficient. Cf. United States v. Moore, 997 F.2d 30, 37 (5th ___ _____________ _____ Cir. 1993) (bullet in leg, extremely painful, two weeks disability; court did not designate which element was met);8 United States v. Reese, 2 F.3d 870, 879 (9th Cir. 1993) ______________ _____ (fractured elbow, arm in a sling), cert. denied, ___ U.S. _____________ ___, 114 S.Ct. 928, 127 L.Ed.2d 220 (1994). We discern no clear error. 18 U.S.C. 3742(e); United States v. Garcia, ______________ ______ 34 F.3d 6, 10 (1st Cir. 1994). Defendants' remaining contentions have been implicitly disposed of by the foregoing discussions, or do not merit further reflection. Affirmed. ________  ____________________ 8. We note that court held two hours hospital emergency room did not constitute "hospitalization." 997 F.2d at 37. -13-