<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1014

                      WILLIAM L. WILLIAMS,

                      Plaintiff, Appellee,

                               v.

                   SCOTT DRAKE AND FRED FORD,

                    Defendants, Appellants.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF MAINE

        [Hon. Eugene W. Beaulieu, U.S. Magistrate Judge]

                             Before

               Selya and Boudin, Circuit Judges,
                                
            and Schwarzer,* Senior District Judge.
                                
                                

    Diane Sleek, Assistant Attorney General, State of Maine, with
whom Andrew Ketterer, Attorney General, and Peter J. Brann,
Assistant Attorney General, were on brief, for appellants.
    Stuart W. Tisdale, Jr. for appellee.

July 14, 1998

                                
_______________
*Of the Northern District of California, sitting by designation.

 SELYA, Circuit Judge.  Two correctional officers, Scott
Drake and Francis ("Fred") Ford, appeal from an adverse jury
verdict awarding damages to a former prison inmate.  They claim
that the lower court erroneously excluded relevant evidence and
improperly retained a juror whose mental faculties were suspect.  
Finding none of their animadversions persuasive, we affirm.
I.  BACKGROUND
 In 1994, plaintiff-appellee William L. Williams resided
in the minimum security cellblock at the Maine Correctional
Institute-Warren (MCI-Warren).  Prison regulations afforded him a
daily three-hour recreational period.  Inmates can spend this
interlude indoors (i.e., in the dayroom, where they can watch
television and make telephone calls) or outdoors (i.e., in the yard
  a paved area where they can play basketball or exercise).
 For obvious reasons, correctional officers keep inmates
under constant observation during the recreational period.  If an
inmate desires to move from the yard to the dayroom, he first must
approach the control booth (a glassed-in enclosure that overlooks
the yard) and request permission.  If leave is granted, the
supervising correctional officer opens a door that separates the
yard from the dayroom.  Once inside, the inmate must remain within
the area demarcated by a yellow line and receive a correctional
officer's permission before crossing the line for any reason.
 On June 19, 1994, Williams proceeded from the cellblock
through the dayroom and into the yard.  He played basketball for a
while.  During a hiatus, he reentered the dayroom (the door to
which temporarily had been left open).  Because the water fountain
was located beyond the yellow line, Williams sought and received
permission to slake his thirst.  As he repaired to the yard, Ford
approached him and asked if he needed to see the nurse.  Williams
replied that he did not, but expressed curiosity as to why Ford had
inquired.  When he did not receive an answer, he returned to the
basketball game.
 Minutes later, the scrimmage ended and Williams decided
to get another drink.  The door to the dayroom was closed, so he
sought and received permission to enter.  Once inside, he again
sought and received permission to cross the yellow line en route to
the water fountain.  After sipping his fill, Williams noticed Ford
and another correctional officer standing directly behind him.  
Ford told Williams that he wanted to talk with him.  Williams asked
if the conversation could wait as his recreational period was
limited and Ford could speak to him at any time.
 On Williams's version of events, Ford questioned his
attitude, told him that his recreational period had ended, grabbed
his arm, and began to lead him back to his cell.  Williams jerked
his arm away and an altercation erupted.  Ford punched Williams in
the face at least three times.  Other correctional officers,
including Drake, entered the fray.  While Williams lay prostrate,
the officers cuffed his hands and shackled his legs.  Drake then
knelt down, placed his hands around Williams's neck, squeezed, and
asked:  "Is this what you want?  Have you had enough?"  Drake's
chokehold lasted no more than twenty seconds.  Several officers
then escorted Williams to new accommodations in MCI-Warren's high
security section.
    A disciplinary board (the Board), an internal body
composed entirely of correctional officers, charged Williams
administratively with inflicting bodily harm on Ford.  Three days
after the melee, the Board held a hearing, found Williams guilty,
placed him in disciplinary segregation, and reduced his accumulated
"good time" credits.
    Invoking 42 U.S.C.  1983 (1994), Williams subsequently
filed an action in the United States District Court for the
District of Maine.  In it, he alleged that his constitutional
rights had been flouted in a variety of ways.  The parties agreed
to proceed before a magistrate judge, see 28 U.S.C.  636(c)
(1994); Fed R. Civ. P. 73(b), who eventually narrowed the case to
Williams's excessive force claim against Drake and Ford.  A jury
trial yielded identical verdicts against both correctional
officers:  $1 in actual damages and $15,000 in punitive damages.  
Following their unsuccessful pursuit of post-trial relief before
the magistrate, Drake and Ford jointly prosecuted this appeal.
II.  ANALYSIS
    We subdivide the appellants' challenge to the jury
verdict into moieties involving, respectively, the disputed
evidentiary rulings and the retention of the suspect juror.
                  A.  The Evidentiary Rulings.
    The appellants assign error to three separate rulings
excluding evidence.  We test each ruling for abuse of discretion,
see Blinzler v. Marriot Int'l., Inc., 81 F.3d 1148, 1158 (1st Cir.
1996); Veranda Beach Club Ltd. Partnership v. Western Surety Co.,
936 F.2d 1364, 1373 (1st Cir. 1991), and then consider the
appellants' cumulative-error plaint.
    1.  The Guilty Plea.  Prior to trial, Williams filed a
motion in limine to exclude evidence of a so-called guilty plea.  
The court granted the motion provisionally, subject to
reexamination of the question at trial.  See, e.g., United Statesv. Holmquist, 36 F.3d 154, 163-66 (1st Cir. 1994) (describing this
salutary practice).  During defense counsel's cross-examination of
Williams, she inquired about the plea, thus sparking a bench
conference.  We recount the relevant facts, consistent with the
representations made to the court at that time.
    When the Board charged Williams with inflicting bodily
harm on Ford during the dayroom scuffle, Williams initially
maintained his innocence.  The Board found otherwise.  Williams
appealed to the warden, who granted a new hearing.  A correctional
officer delivered notification of this action to Williams at 6:45
a.m. on June 21, 1994.  Williams claims to have been groggy due to
the early hour and unaware that the notification concerned a newhearing.  Convinced that further attempts to exonerate himself
before decisionmakers whom he considered biased would be futile, he
crossed out his previous "not guilty" plea and entered the word
"guilty" on the form.  As a result, no new hearing transpired.
    Upon considering these facts, and hearing both lawyers at
length, the magistrate reaffirmed his earlier ruling, sustained the
plaintiff's objection to the pending question, and reminded counsel
that such questions were prohibited.  Significantly, the court did
not preclude testimony concerning the disciplinary proceedings in
gross, but stated repeatedly that the defense could ask Williams
about the nature of the hearing and about any statements that he
made before the Board.
    At the end of the plaintiff's case in chief, defense
counsel made an adequate offer of proof as to what would have been
asked and answered with regard to this guilty plea had she been
given the opportunity to inquire.  In rejecting this tender, the
magistrate elaborated on his rationale for excluding the evidence.  
He reasoned that admitting the evidence would necessitate a trial
within a trial, focusing too bright a spotlight on Williams's
motivation for changing his plea.  In the court's view, this detour
would likely confuse the jurors and divert their attention from the
issues committed to their discernment.
    Fed R. Evid. 403 controls this point.  Trial courts have
significant leeway in determining whether to admit or exclude
evidence under the aegis of Rule 403.  See Daigle v. Maine Med.
Ctr., Inc., 14 F.3d 684, 690 (1st Cir. 1994).  This latitudinarian
approach dictates that "only rarely   and in extraordinary
circumstances   will we, from the vista of a cold appellate record,
reverse a district court's on-the-spot judgment concerning the
relative weighing of probative value and unfair effect."  Freemanv. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988).  Viewed
against this welcoming backdrop, the court's exclusion of the
guilty plea evidence passes muster.
    The appellants harp on the demonstrable relevance of the
guilty plea evidence.  But this is only part of the picture.  Rule
403 allows the exclusion of evidence which, though relevant,
carries unwanted baggage, such as unfair prejudice or potential
juror confusion.  See United States v. Fulmer, 108 F.3d 1486, 1498
(1st Cir. 1997); United States v. Boylan, 898 F.2d 230, 255-56 (1st
Cir. 1990).  Even an admission by a party opponent is subject to
exclusion under Rule 403 if its potential for unfair prejudice
overwhelms its probative worth.  See 5 Jack B. Weinstein et al.,
Weinstein's Federal Evidence  801.20[3], at 801-44 (2d ed. 1998).  
The rule thus constitutes a tool that a trial judge can use to keep
a jury's attention riveted on the dispositive issues.
    In this instance, the magistrate had adequate reason to
wield the tool.  The probative value of the guilty plea evidence
was limited; after all, the jury heard testimony anent the
proceedings before the Board, and the circumstances surrounding the
plea made Williams's explanation of how it came about plausible.  
Then, too, the potential for muddling the issues was real:  the
procedural and substantive differences between a prison
disciplinary board hearing and a jury trial easily could have led
to confusion.  Moreover, delving into Williams's motivation for
changing his plea could well have created an unwarranted sideshow,
drawing attention from the main event.  Equally as important, the
proffered evidence contained the seeds of unfair prejudice.  The
jury might have been tempted to find against Williams solely on the
basis that he admitted guilt to the Board, rather than focusing on
the central (and substantially separate) issue of whether the
appellants' use of force was appropriate under the circumstances.
    This is not to say that the magistrate, in the exercise
of his discretion, could not have admitted the evidence.  But Rule
403 determinations, by their nature, are judgment calls   and on
this occasion, the magistrate deemed exclusion the better course.  
Nor did he reach this conclusion casually:  he approached the
problem cautiously, deferring a final decision until the evidence
appeared in full context; then, based on the guilty plea's
relatively low probative value and its potential for breeding
confusion, distraction, and undue prejudice, he rejected the
proffer.  Given this careful balancing, we cannot say that the
trial court exceeded its wide discretion in deciding to exclude the
evidence.  See Diaz v. Cianci, 737 F.2d 138, 139 (1st Cir. 1984)
(holding evidence of a plaintiff's conviction in a juvenile
proceeding for assaulting officers excludable as prejudicial in a
subsequent lawsuit).
    2.  MCI-Warren.  During opening statements, defense
counsel referred to Williams's home away from home as the "highest
security prison in the State of Maine, housing the most dangerous
prisoners in the State of Maine."  Williams's counsel objected to
this categorization and the magistrate sustained the objection.  
During a subsequent bench conference, defense counsel asked for an
explanation.  The magistrate stated that he believed the reference
was unduly prejudicial; labeling the security status of MCI-Warren
and stereotyping its denizens could lead the jury to conclude that
Williams must be a menace and, hence, that the officers' conduct
during the dayroom incident was justified.
    We find no abuse of discretion in the magistrate's
ruling.  As we already have observed, under Rule 403, potentially
inflammatory evidence may be excluded if the danger of unfair
prejudice substantially outweighs its probative value.  See United
States v. Houlihan, 92 F.3d 1271, 1282 n.6 (1st Cir. 1996), cert.denied, 117 S. Ct. 963 (1997).  Describing MCI-Warren as a
repository for Maine's most dangerous offenders tends to stereotype
Williams.  As the magistrate explained, this portrayal could have
wrought unfair prejudice by inducing the jury to turn aside
Williams's lawsuit based on assumed character traits, rather than
on competent evidence.
    The propriety of this ruling is reinforced by the narrow
crafting of the preclusion.  Far from prohibiting all relevant
testimony about security issues, the magistrate allowed the defense
to introduce proof of MCI-Warren's security procedures and barred
only the effort to affix a pejorative label on the facility and its
occupants.  A ruling that curbs rhetorical flourishes, but
nonetheless allows the introduction of the substance underlying the
disputed point, rarely will violate Rule 403.  See, e.g., Boylan,
898 F.2d at 255-56.  No such violation exists here.
    3.  The Consequences of Indiscretion.  On Ford's redirect
examination, his counsel sought to elicit testimony about the
disciplinary consequences that might attend a correctional
officer's unjustified striking of an inmate.  Williams's lawyer
objected successfully.  The appellants assign error.
    We do not need to dwell upon the speculative nature of
the question (although that, in itself, might well be a valid
ground for upholding the objection).  It is a bedrock rule of trial
practice that, to preserve for appellate review a claim of error
premised on the exclusion of evidence, the aggrieved party must
ensure that the record sufficiently reflects the content of the
proposed evidence.  Here, the appellants made no offer of proof as
to what Ford's response would have been if permitted to answer the
question.  That omission is fatal.  See Fed. R. Evid. 103(a)(2);
see also Cumpiano v. Banco Santander P.R., 902 F.2d 148, 157 n.4
(1st Cir. 1990); McDonald v. Federal Labs., Inc., 724 F.2d 243, 248
(1st Cir. 1984).
    4.  Cumulative Effect.  The appellants attempt to find
strength in numbers by contending that the cumulative effect of the
disputed evidentiary rulings so tainted the proceedings as to
require a new trial.  The argument is no stranger to this court.  
See, e.g., United States v. Sepulveda, 15 F.3d 1161, 1195 (1st Cir.
1993), United States v. Dwyer, 843 F.2d 60, 65 (1st Cir. 1988).  To
deploy it successfully, however, a party must establish that
individual miscues, while insufficient in themselves to warrant a
new trial, have an aggregate effect that impugns the fairness of
the proceedings and thus undermines the trustworthiness of the
verdict.  See Sepulveda, 15 F.3d at 1195-96.  In other words, we
will order a new trial on the basis of cumulative error only if
multiple errors synergistically achieve "the critical mass
necessary to cast a shadow upon the integrity of the verdict."  Id.at 1196.
    This principle is cold comfort to the appellants.  As
discussed supra, we find no error in the trial court's serial
decisions to exclude the three pieces of evidence that the
appellants wanted to introduce.  Absent any particularized error,
there can be no cumulative error.  See United States v. Stokes, 124
F.3d 39, 43 (1st Cir. 1997) (holding that "cumulative-error
analysis is inappropriate when a party complains of the cumulative
effect of non-errors"), cert. denied, 118 S. Ct. 1103 (1998).  
Hence, this assignment of error collapses of its own weight.
                   B.  The Loquacious Juror.
    During a recess on the first day of trial, a voluble
juror struck up a conversation with a court attach.  The juror   
whom we shall call by the nom de guerre "Smith"   recounted his
recent jury service in an unrelated criminal case and confided that
he had come to believe the accused might be involved in the
celebrated murder of JonBenet Ramsey.  The attach brought this
remark to the magistrate's attention later that day and the
magistrate promptly informed the lawyers.  Defense counsel
requested Smith's ouster, but Williams's attorney demurred.  The
magistrate declined to decommission the juror, noting that Smith's
statement concerned a completely unrelated case.  The appellants
protest this decision, claiming that Smith's continued jury service
and his participation in the deliberations tainted the verdict
because his comment conclusively evidenced his incompetence to make
a rational judgment.
    Fed R. Civ. P. 47(c) provides that a trial judge "may for
good cause excuse a juror from service."  We review the trial
court's exercise (or non-exercise) of this authority for abuse of
discretion.  See United States v. Gonzalez-Soberal, 109 F.3d 64, 69
(1st Cir. 1997).  The magistrate's decision to permit Smith's
continued service fell well within the ambit of this discretion.
    We start with the obvious.  Smith's remark does not
evince any bias in Williams's favor or any prejudice against the
appellants; indeed, as the magistrate observed, the comment has no
bearing whatever on the case sub judice.  Moreover, the comment
does not call into legitimate question Smith's ability to decide
the case at hand based solely on the evidence presented at trial.  
Under ordinary circumstances, then, it would not be error to retain
the juror.  See id. at 69-70; United States v. Angiulo, 897 F.2d
1169, 1185 (1st Cir. 1990).
    Of course, the appellants asseverate that the
circumstances here are far from ordinary.  Smith's statement, they
maintain, is so bizarre that it makes manifest his incompetency to
sit in judgment on any case.  We accept the appellant's core
premise:  a person incapable of making rational judgments should
not be permitted to serve on a trial jury if that disability is
called to the judge's attention and a party seasonably requests the
juror's removal.  See United States v. Walsh, 75 F.3d 1, 4-5 (1st
Cir. 1996).
    Having accepted this premise, however, we do not share
the appellants' conclusion.  The juror's remark, though peculiar,
did not in and of itself evince an inability to form rational
judgments, particularly since no meaningful context was afforded
within which to evaluate the statement.  Consequently, it was not
incumbent on the court to remove Smith from the panel.  See United
States v. Vargas, 606 F.2d 341, 345-46 (1st Cir. 1979) (holding
that, absent clear evidence of incompetency, trial court did not
abuse its discretion by retaining juror); cf. United States v.
Corbin, 590 F.2d 398, 400 (1st Cir. 1979) (affirming juror's
removal, but noting that removal was discretionary, not mandatory,
when the suspect statement seemed "more a piece of eccentricity
than a meaningful comment").
    Our conclusion is fortified by the appellants' actions.  
Although Smith's statement sounds more than a bit farfetched, it
cannot meaningfully be evaluated on this exiguous record   and the
appellants did nothing either to fill this void or to create a
record that might lend credence to their fears about Smith's
rationality.  A voir dire inquiry into a juror's fitness for
continued service is often a useful testing device, see, e.g.,
Thorpe v. Mutual of Omaha Ins. Co., 984 F.2d 541, 545 (1st Cir.
1993), but the appellants at no time suggested such an inquiry.  
The challenged comment was not so plainly indicative of unfitness
that it required the trial court, without more, to oust the juror,
and the responsibility for requesting a more in-depth probe rested
with the parties objecting to Smith's continued participation.  SeeUnited States v. Newman, 982 F.2d 665, 669-70 (1st Cir. 1992).  In
this type of situation, courts   like the Deity   are more prone to
help those who help themselves.
    We need go no further.  We conclude that on this
bareboned record the magistrate's decision that Smith was
presumptively fit to continue serving as a juror in a civil case
unrelated to the notorious murder to which his eccentric comment
pertained was not an abuse of discretion.

Affirmed.

</body>

</html>