**UNITED STATES, Appellee,**

v.

**Anthony A. WILLIAMS, Private U.S. Army, Appellant.**

No. 46,475.

CM 442712.

U.S. Court of Military Appeals.

March 16, 1987.

For Appellant: *Captain Robert W. Wiechering* (argued); *Colonel William G. Eckhardt, Major Warren G. Foote, Captain William T. Wilson* (on brief); *Colonel R. Rex Brookshire, II, Major Robert C. Rhodes, Captain Stephen R. Dooley.*

For Appellee: *Captain John J. Park, Jr.* (argued); *Colonel James Kucera, Lieutenant Colonel John T. Edwards, Lieutenant Colonel Joseph A. Rehyansky* (on brief); *Lieutenant Colonel Adrian J. Gravelle.*

## OPINION OF THE COURT

EVERETT, Chief Judge:

A general court-martial composed of officers tried appellant in Schweinfurt, Federal Republic of Germany, on a charge of attempted robbery, in violation of Article 80, Uniform Code of Military Justice, 10 U.S.C. § 880. Williams pleaded guilty to the lesser-included offense of assault and battery but was found guilty as charged. The sentence adjudged was a bad-conduct discharge, confinement for 1 year, and total forfeitures. The findings and sentence were approved by the convening authority and thereafter affirmed by the Court of Military Review. We granted review to consider:

> WHETHER THE ARMY COURT OF MILITARY REVIEW ERRED BY CONCLUDING THAT THE APPELLANT'S STATEMENT THAT HE HAD "BEEN IN A FIGHT IN [HIS] ROOM OVER SOME RECORDS," GIVEN IN RESPONSE TO QUESTIONING, WAS A PHYSICAL ACT WHICH REQUIRES NO PRELIMINARY WARNING.

## I

When appellant was arraigned at an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, defense counsel moved *in limine* to suppress any evidence from a proposed defense witness, Sergeant Kay T. Thompson, about statements Williams had made to him. The defense contended that these statements had not been preceded by proper advice from Sergeant Thompson, a military policeman, as to appellant's rights and also that cross-examination as to the statements would go beyond the scope of the evidence which the defense had planned to adduce from Sergeant Thompson on direct examination. When the military judge asked trial counsel if he "intend[ed] to get into any of that," the reply was:

The only reason I might ask if there were any statements made by the accused on the night in question would be to rebut the implication of intoxication to show that the accused was capable of holding a conversation and making rational statements on the evening in question. That would go towards the intoxication issue.

The judge next inquired if the prosecution had given the defense "notice ... of the existence of such incriminating statements," *see* Mil.R.Evid. 304(d)(1), Manual for Courts-Martial, United States, 1969 (Revised edition); and trial counsel responded that, although no formal notice had been given, the statements had been included in the transcript of the Article 32, UCMJ, 10 U.S.C. § 832, investigation. Then the judge remarked that he had not received notice of the defense motion to suppress for lack of a "proper rights advisement" as was required by the local Rules of Court. These rules had been promulgated several months before by the judges of the U.S. Army Trial Judiciary, Fifth Judicial Circuit, which covers Europe. Rule of Court I.3.a, which concerns "post docketing procedures," provides:

In accordance with Paragraph 2–28, Army Regulation 27–10, and Rule 34, Uniform Rules of Practice Before Army Courts-Martial, Appendix H, Military Judges' Guide, DA Pam 27–9, moving counsel will present to opposing counsel and the judge notice of any motions or other pleadings prior to an Article 39(a) hearing. Motions and Hearings Checklist, Figure H-1, page H–6, DA Pam 27–9, will be utilized for this purpose. The Motions notice will be in writing and a statement of the substance of the motions issues and the points of law and authorities on which counsel rely provided to the trial judge. Motions will be served on opposing counsel at least 5 working days before trial, any reply briefs will be filed as soon as possible thereafter. Counsel should be prepared to dispose of all motions at one preliminary Article 39(a) session in conjunction with the trial or prior thereto. Briefs should be submitted by both parties on complex motions. Special Defenses such as alibi and insanity are covered by the foregoing.

After ascertaining from defense counsel that he was aware of the Rules of Court requiring notice to the military judge of a motion, the judge asked if the defense had "any good cause to show why I should grant an exception for your failure to comply with the Rules of Court?" The only cause offered was "the fact that the defense would argue that this evidence, which might be elicited by the prosecution, is inadmissible." The military judge then ruled that he would not hear the motion and stated that he considered the noncompliance with the Rule of Court to constitute a waiver. Accordingly, "if you open the door by calling this witness, I'll allow ... [trial counsel] to cross-examine on that very point and next time I expect you to comply with the Rules of Court."

After the pleas had been entered and the court members selected, the Government presented its case-in-chief, which consisted of the testimony of the victim, Specialist Six John N. Hazelton. According to Hazelton, he had been walking home from work at about 2:45 a.m. when he heard someone shouting at him. Thereupon appellant approached him and asked for cab fare. Ha-

zelton reached in his pocket and rummaged around but kept walking. Williams grabbed his arm, yelled at him, and tried to pull him back in the direction from which he had come. The two continued to move and struggle until Hazelton "turned and kind of ducked and because he still had a hold of my arm, I flipped him over my shoulder and he landed on the ground." Hazelton reached down to help appellant up. When "he got up," appellant stated, "Oh! You know karate. Well, so do I." Then he began to strike at Hazelton.

As Hazelton blocked appellant's punches, he became aware of someone else behind him; heard someone yell; and "was spun around" and hit in the face. Williams grabbed Hazelton in a headlock and tried to wrestle him to the ground. While doing so, he complained that Hazelton "was getting blood on his coat." As Hazelton began to shout "for help," the second assailant came up from behind and grabbed his back pocket. Hazelton continued to struggle and broke away. "And then after that, things become pretty confused and the only thing I remember is a vehicle pulled up, which I learned later was a cab, and they left."

According to Hazelton, if he had not resisted, Williams and the other man would have taken his wallet. Asked whether he had "any indication that the accused and the other individual were working together or knew each other", Hazelton replied that "just by their actions of working together in holding me that it appeared that they knew each other." When Williams made comments to him about cab fare, getting blood on his coat, and knowing karate, Hazelton understood what he was saying. Moreover, appellant did not "seem to have any difficulty in fighting." Although Hazelton could not understand some of appellant's yelling, "at that particular time I was a little scared and it's understandable that I wasn't really concerned about what he was saying."

Specialist Four Jerale D. Crutcher testified as a defense witness that on the night in question appellant had been drinking heavily and "was definitely drunk." Also,

"[h]e was saying things that didn't make any sense." Sergeant Elmore Capehart had observed appellant's drunken condition and had refused to let Williams enter a bar, which the witness was managing during his off-duty hours. "He couldn't half stand up."

Sergeant Kay Thompson, the final defense witness, testified that he had apprehended Williams. At that time, appellant's "speech sounded slurred or mush-mouthed and he sort of stumbled his words, you know, stuttered." His eyes "were sort of constricted. Had a glazed look to them and the far away look, you know, set back off in the head." There "was a moderate odor" of alcohol; and Williams "needed support," because he was "continually stumbling and leaning against the walls." In Thompson's opinion, appellant was drunk.

On cross-examination, Thompson testified that in the Alcohol Influence Report which he prepared, he had stated that there was a "[m]oderate odor" of alcohol and that Williams had been "[s]leepy." He did not mention in his report any "Unusual Actions"—such as "hiccoughing, belching, vomiting, fighting, crying, laughing." Appellant's speech was reported as "[m]umbled," but not as being "[n]ot [u]nderstandable." With respect to appellant's "Ability To Understand Instructions," Thompson's evaluation was "good." The "Effects of Alcohol" were reported as "[o]bvious," rather than "extreme."

Thompson had informed appellant of the offense of which he was suspected; and he had appeared to understand that explanation. When trial counsel inquired whether Thompson had asked appellant "about some blood stains on his coat," the defense requested an Article 39(a) session. In the hearing which ensued, defense counsel noted that this was "the same matter that" had been raised in connection with the earlier motion in limine. He contended:

The defense has brought forth Sergeant Thompson merely for the purposes of stating the accused's physical condition, his speech, his eyes, and his apparent

drunken condition. The prosecution is seeking to elicit information concerning statements, which the defense contends are inadmissible and we would feel that this particular evidence should be suppressed, not only because of its inadmissible character, but it should be suppressed because it is unduly prejudicial and it exceeds, it goes beyond the scope of the direct examination of Sergeant Thompson.

Trial counsel replied that the defense had "opened the door to these questions" by bringing "in ... witnesses who have discussed his apparent ability to speak coherently, his inability to conduct a rational thought process." According to the prosecutor, the answers to be given by Sergeant Thompson would "demonstrate ... that the accused was, in fact, able to respond to questions. He was able to conduct a rational thought process and was, in fact, able to speak up in his own defense on the evening."

Before ruling on admissibility, the judge decided to determine what the answers would be. Thompson then testified that, when he asked appellant about "the blood stains ... on his coat," his reply "was that I had a fight in my room," and "at another time his response was that he had been fighting over some record albums." Sergeant Thompson also explained that he had asked the questions about the blood stains as a preliminary action to "confiscating the coat as evidence... All markings, blood stains, I wanted to know, primarily, if they were his, if he was hurt, or if they, you know, if it was, in fact, evidence, I needed to preserve it."

The military judge then ruled that the defense had "opened the door for such questioning" by eliciting "answers to the effect that the accused's speech was slurred and he stuttered." He also stated that he would "instruct the court that the responses are not offered for the truth of the matter stated therein, but are offered to rebut and only to rebut the contentions of the defense that the accused was drunk, at that time." He then added: "I still

believe that you waived your right by not complying with the Rules of Court on the motion."

When the Article 39(a) session ended and the court members returned to the courtroom, trial counsel was allowed to elicit, by cross-examination, testimony about the two statements appellant had made to him and to express his opinion that the accused was "able to hold a conversation with" him at that time. On redirect, Thompson explained that appellant's statements to him had not been "incoherent"; but Williams "was totally intoxicated." As soon as Sergeant Thompson's testimony ended, the military judge advised the members as follows:

> The responses that Sergeant Thompson received from the accused were being brought to your attention only for the purpose of trying to establish that the accused was able to think and respond coherently to the question. Thus, the Government's attempt to rebut the defense evidence of intoxication. It's not being offered for the truth of the matter stated therein and you are not to infer that there was another incident involving the accused that night or speculate, in anyway, what the accused was really talking about.

After the final arguments, the military judge instructed the members on the elements of the offense. In connection therewith, he advised them on the law of principals in order to deal with the government theory that appellant was aiding and abetting the other man who attacked Hazelton. The judge also informed the members that evidence of voluntary intoxication was relevant to their determination about appellant's intent.

## II

In *United States v. Kelson,* 3 M.J. 139 (C.M.A. 1977), this Court considered the validity of a Rule of Practice before Army Courts-Martial, which had been promulgated by the Secretary of the Army. This Rule required: "As soon as practicable after service of charges, ... a defense

counsel who wishe[d] to present a motion or other pleading w[ould] prepare and furnish [it] to the trial counsel" and "provide a copy to the trial judge." [1] The military judge concluded that a defense motion to dismiss a charge on grounds of multiplicity had not been submitted in compliance with this rule. However, on appeal this Court decided that the rule "established a condition precedent to appellant's right to raise motions" which was "inconsistent with the procedural rule set forth in the Manual." *Id.* at 140. The applicable provision in the Manual for Courts-Martial stated that motions to dismiss "should ordinarily be asserted ... before a plea is entered; but failure to assert them at that time does not constitute a waiver of the defense or objection." *See* para. 67*a*, Manual, *supra.* Since the Army Rule of Practice imposed an additional requirement of timeliness, it burdened counsel in a manner not authorized by the Manual for Courts-Martial, so the Rule was invalid.

Mil.R.Evid. 304(d)(2) provides that "[m]otions to suppress" an accused's statements "shall be made by the defense prior to submission of a plea." Absent such a motion, "the defense may not raise the issue at a later time except as permitted by the military judge for good cause shown"; and "[f]ailure to so move ... constitutes a waiver of the objection." The Rule of Practice in the Army Judiciary's Fifth Circuit—the local rule with which we are now concerned—adds an additional requirement —namely, that the defense serve the motion on the Government "at least 5 working days before trial" and provide a copy thereof to the judge.

■ Certainly, there are some advantages to the establishment of such a requirement. Delays and continuances in Article 39(a) sessions and in trials can be minimized or completely avoided. However laudable these objectives may be, they do not permit overriding Rules prescribed by the President in the Manual for Courts-Martial. In Mil.R.Evid. 304(d)(2), he imposed only the requirement that a motion

to suppress be made "prior to submission of a plea." Appellant complied with this requirement. Imposition of a duty to file the motion at an even earlier time is in conflict with the Manual. Accordingly, the military judge erred in refusing to consider the merits of defense objections to reception of evidence concerning the statements.

Of course, our conclusion as to this local Rule of Practice does not mean that all local rules are invalid. We only have before us a Rule which we have determined conflicts with a provision of the Manual for Courts-Martial—just as was true of the rule held invalid in Kelson.

### III

■ The Court of Military Review concluded that the two statements by appellant to Sergeant Thompson "can be viewed properly as a physical act, such as giving voice or handwriting exemplars, which requires no preliminary warning." Unpublished opinion at 2. We recognize that, under some circumstances, the words spoken or written by an accused may be received in evidence even though they were taken by an investigator without any Article 31(b), UCMJ, 10 U.S.C. § 831(b), warning. For example, handwriting exemplars are admissible despite the absence of a warning. *United States v. Lloyd*, 10 M.J. 172 (C.M.A. 1981). The rationale is that Article 31, like the Fifth Amendment, focuses on testimonial compulsion. *See United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (handwriting exemplars); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (handwriting exemplars); *see also United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (voice exemplars); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (voice exemplars). However, these were cases where the content or meaning of the words spoken or written was irrelevant. Only the physical characteristics of the words—*how*

---

1. He also was required to submit a Motions and Hearings Checklist.

they were said and not *what* was said— were material.

■ In the present case, however, the Government was seeking to bring before the trier of fact the contents of the utterances. Under these circumstances, the guiding precedent is *People v. Rucker,* 26 Cal.3d 368, 162 Cal.Rptr. 13, 605 P.2d 843 (1980), where a defendant's statements were offered to rebut a defense of voluntary intoxication. The People argued that the defendant's "responses were not testimonial because their *contents* were irrelevant. What was essential was not the *contents* of appellant's disclosures, but the *fact* that he was able to articulate appropriate responses." The California Supreme Court rejected this argument, because it "overlooks the fact that the contents of appellant's disclosures were necessarily relevant to the purpose for which they were admitted. Only by examining whether his disclosures were responsive and accurate could anything be inferred about a lack of diminished capacity." *Id.* 162 Cal.Rptr. at 22, 605 P.2d at 852. *Cf. United States v. Hinckley,* 672 F.2d 115, 125 (D.C. Cir. 1982).

The situation is somewhat akin to that which arises in connection with a mental examination of an accused. According to Mil.R.Evid. 302, "[a]n expert witness for the prosecution may testify as to the reasons for ... [his] conclusions ... [about] the mental state of the accused ... but such testimony may not extend to statements of the accused," unless they have first been introduced into evidence by the defense. *See* Mil.R.Evid. 302(b). Likewise, Sergeant Thompson was free to testify as to his conclusions concerning appellant's intoxication. He could explain that one of the reasons for his conclusion was that the accused understood his questions and gave responsive answers. However, he could not give the contents of any answers which related in any way to the offense.[2]

The Government has also asserted that appellant's answers about the blood on his coat were admissible because they are analogous to the answers to questions asked when an arrested suspect is booked. In this connection, appellate government counsel points to *United States v. Davenport,* 9 M.J. 364 (C.M.A. 1980), where we ruled that an accused's answer to a policeman's question about his identity was admissible even though it had not been preceded by a warning. Moreover, the Supreme Court apparently excludes from the term "interrogation" the questioning of a defendant which is "normally attendant to arrest and custody." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

However, when we look at the facts of this case, it is hard to see how a question about blood on appellant's coat at the time of his apprehension could be considered part of the booking process. If Williams had been bleeding and, in order to determine his physical condition, a question had been asked about how he got hurt, the situation might be different. However, the circumstance that the coat was being seized as evidence does not seem to authorize admission of the statement about how the blood got there. Clearly the questions asked by Sergeant Thompson were intended to help solve a suspected crime, rather than to identify a piece of property being taken into police custody.

Appellate government counsel have also invoked *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), as a justification for the reception of appellant's statements to Sergeant Thompson. Of course, *Harris* involved the use of otherwise admissible evidence to impeach sworn testimony given at trial by the defendant; and appellant never took the stand. Our attention has not been directed to any case which holds that a statement otherwise inadmissible because of violation of a warning requirement can be received in rebuttal

---

2. Of course, the defense would be free to inquire about the contents of any statements relating to the offense; and, once it had done so, the

prosecution could also inquire about the contents.

merely because it is at odds with some of the defense evidence other than the defendant's own testimony. Indeed, the rationale of *Harris*—to prevent perjury by a defendant—does not apply to such a situation.

Finally, from the language of Mil.R.Evid. 304 and the Drafters' Analysis, it appears that *Harris* is inapplicable where the statement to be offered in rebuttal was "obtained in violation of" Article 31(b)'s warning requirement. App. 18, Manual, *supra*. Mil.R.Evid. 304(a) states the general rule that "[a]n involuntary statement or any derivative evidence ... may not be received in evidence against an accused who made the statement if the accused makes a timely motion to suppress or an objection to the evidence." For purposes of Mil.R.Evid. 304, "[a] statement is 'involuntary' if it is obtained in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." Mil.R.Evid. 304(c)(3). An exception is provided under Mil.R.Evid. 304(b) if the statement was "involuntary only in terms of noncompliance with the requirements concerning counsel under rules 305(d), 305(e) and 305(g)" and is being offered "to impeach by contradiction the in court testimony of the accused." The requirements concerning counsel under Mil. R.Evid 305(d)-(e) do not include violations of Article 31(b)'s warning requirement. Their listing of one exception implies that the drafters of Mil.R.Evid. 304 did not intend to authorize an additional exception for statements obtained in violation of Article 31(b). In effect, statements obtained in violation of the Article 31(b) warning requirement are being treated by Mil.R.Evid. 304 like truly involuntary statements under *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Accordingly, the very language of Mil.R.Evid. 304 precludes the use of *Harris v. New York*, *supra*, in the present case.

The Government further insists that, in light of the limiting instructions given by the military judge, the court members would have only considered appellant's statements to Sergeant Thompson in determining whether he was sober enough to comprehend questions being asked him. Thus, the statements would have been treated as being neutral—like questions about the weather, the time of day, and distances.

We note, however, that the instructions were that the statements could be used for a limited purpose, rather than that they should be disregarded altogether. With this in mind and in light of the other circumstances of this case, we do not believe that the instructions cured the error.

With respect to the attempted-robbery charge, we note that no property was taken and that the actions most related to taking Hazelton's property were not performed by Williams but by the other man. Moreover, the evidence of appellant's intoxication was substantial. Under these circumstances, we cannot conclude that the court members did not use the evidence of the two statements in a manner harmful to appellant.[3]

### IV

Because the military judge refused to consider the defense motion to suppress the statements, no evidence was received as to whether Thompson provided appellant the warnings required by Article 31(b) and by *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). We note, however, from the allied papers that Sergeant Thompson testified during the Article 32 investigation, and the summary of his testimony indicates that he had warned appellant before obtaining the statements from him. In that event, the statements would be admissible.

Of course, we do not wish to foreclose the Government from proving that the statements were properly obtained by Sergeant Thompson. Accordingly, we will

---

**3.** For example, the members may have inferred that Williams gave a false explanation of the

source of the bloodstain and that his doing so indicated a guilty conscience.

permit further proceedings to determine this matter.

The decision of the United States Army Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Army for remand to that court, which may order a *DuBay* [4] hearing to determine admissibility of the statements by appellant to Thompson; affirm the lesser-included offense to which appellant pleaded guilty and reassess the sentence; or order a rehearing on attempted robbery and the sentence.

Judge COX concurs.

Judge SULLIVAN did not participate.

---

[4]. *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).