*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
GASTON, STEWART, and MYERS
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Jacob M. TAYLOR**
Electrician's Mate Third Class (E-4), U.S. Navy
*Appellant*

**No. 202000263**

_____

Decided: 28 April 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Benjamin C. Robertson (arraignment)
Hayes C. Larsen (motions and trial)

Sentence adjudged 31 July 2020 by a general court-martial convened at Naval Station Norfolk, Virginia, consisting of officer and enlisted members. Sentence in the Entry of Judgment: reduction to E-1, confinement for 24 months, and a bad-conduct discharge.

For Appellant:
*Captain Jasper W. Casey, USMC*

For Appellee:
*Lieutenant Commander Jeffrey S. Marden, JAGC, USN* (argued)
*Lieutenant Gregory A. Rustico, JAGC, USN* (on brief)

Senior Judge GASTON delivered the opinion of the Court, in which Judges STEWART and MYERS joined.

———————————————

**PUBLISHED OPINION OF THE COURT**

———————————————

GASTON, Senior Judge:

Appellant was convicted, contrary to his pleas, of conspiring to wrongfully distribute lysergic acid diethylamide [LSD], soliciting the wrongful distribution of psilocybin mushrooms, wrongfully using LSD, wrongfully distributing LSD, and communicating a threat, in violation of Articles 81, 82, 112a, and 115, Uniform Code of Military Justice [UCMJ].[1] He asserts three assignments of error [AOE]: (1) the military judge abused his discretion by admitting evidence obtained in violation of Article 31(b), UCMJ; (2) Appellant's conviction for communicating a threat is legally and factually insufficient; and (3) his sentence is inappropriately severe. This Court ordered oral argument on the following specified issues pertaining to Appellant's first and second AOEs, for which the parties also provided additional briefing:

> **I. *For purposes of determining whether the inevitable-discovery exception applies,***
>
>> **A. *Is determining the routine procedures of a law enforcement agency a legal or a factual determination?***
>>
>> **B. *Must such a determination consider the agency's actions only up to the point of the constitutional violation, or may it also consider the agency's actions after the constitutional violation?***
>
> **II. *For purposes of determining whether the evidence is legally and factually sufficient for Charge VII, communicating a threat,***
>
>> **A. *What words constituted the threat, when was it made, and to whom was it communicated?***

———————————

[1] 10 U.S.C. §§ 881, 882, 912a, 915.

> **B. Is there a material variance if the specification as charged alleges the threat was made directly to the victim but the evidence shows it was communicated to a third party?**
>
> **C. Does to whom the charged communication was made impact whether it constituted a threat or was wrongful?**

We find merit in Appellant's second AOE and set aside his conviction for communicating a threat in violation of Article 115, UCMJ. We affirm the remaining findings and, upon reassessment, affirm the sentence.

## I. BACKGROUND

In 2019, in a conspiracy with another Sailor, Appellant distributed LSD in the vicinity of Norfolk, Virginia, where his ship was homeported. One evening in early April, after using LSD, Appellant became concerned his "stash" would be discovered by another servicemember. In response, his girlfriend, Ms. Charlie,[2] took the LSD and threw it away in an outdoor trashcan, where it was ruined by rain.

A few days later, while drinking alcohol with Fireman Apprentice [FA] Victor and Fireman [FN] Juniper, Appellant got into a drunken argument with Ms. Charlie about the destruction of his LSD. When Ms. Charlie told Appellant to be careful what he said, he "flew up out of the chair coming after [her]" with "a rage in his face that [she] had never seen in [her] entire life," causing her to run upstairs and lock herself in a different room.[3] After Ms. Charlie went upstairs, Appellant said to the two other Sailors, "I'm going to kill the b[***]."[4] FA Victor heard Appellant's statement, but "didn't think he was serious because of his drunken state."[5] FN Juniper did not recall hearing the statement, but remembered breaking up the argument and later having a discussion with Ms. Charlie about Appellant having "threatened her."[6] When Ms. Charlie came

---

[2] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[3] R. at 603.

[4] R. at 797, 799.

[5] R. at 800.

[6] R. at 697.

back downstairs after Appellant fell asleep, she appeared concerned for her safety. A week later, she agreed to pay Appellant $500 for the LSD.

In early May, Ms. Charlie gave a note to a uniformed master-at-arms at the restaurant where she worked. The note read, "I don't know who to go to. I am scared, not just for my safety but my life. A man I have been off and on with told me he wanted to kill me."[7] When interviewed by the Naval Criminal Investigative Service [NCIS], Ms. Charlie stated that Appellant had assaulted her and threatened her over the destruction of the LSD, and she showed the agents the text messages wherein she had agreed to pay him $500 to cover the loss. The agents then called Appellant in for questioning.

During Appellant's first interrogation on 3 May 2019, he was advised that he was only suspected of violating UCMJ Articles 128 (assault) and 134 (communicating a threat), not Article 112a (controlled-substance offenses). Nevertheless, after Appellant waived his rights, the agents questioned him about the $500 Ms. Charlie owed him for destroying his LSD. Two weeks later, on 16 May 2019, the agents interrogated Appellant a second time after securing a command authorization to seize and search his cellphone for "[e]vidence of electronic communications regarding the wrongful use, possession, and distribution of controlled substances."[8] This time Appellant was advised that he was suspected of Article 112a offenses. After he again waived his rights, he was asked about where he had acquired the drugs, which prompted the following exchange:

Appellant: I think I'd better stay silent on this one, no reason to drag other people into this.

NCIS Agent: Okay. That's your right. All right. Let me—we're actually both going to step out. Give us a couple minutes, and we'll come back, and we'll get you out of here, okay?[9]

When the agents returned, they served Appellant with the command authorization for search and seizure of his cellphone and asked for its location and passcode. Appellant responded that it was in his locker aboard the ship and told them the passcode.

---

[7] Pros. Ex. 1; R. at 608.

[8] App. Ex. XII at 7.

[9] App. Ex. XIII(a) at 5.

Appellant's phone was seized from the locker and unlocked using the passcode he provided. A forensic search of its contents yielded evidence of Appellant's involvement in various illegal-drug-related activities. Among other things, the evidence supported that he regularly used and distributed LSD; had a supplier in Canada; and was stockpiling LSD for use during deployments on his ship, where he was "cultivating a wee little cult" and intended to "slowly introduce folks and ease [th]em into" using the drug as a means of developing a market for it.[10]

## II. DISCUSSION

### A. Inevitable Discovery

Prior to trial, Appellant moved to suppress his statements to NCIS and any evidence derived from them. In a written ruling, the military judge suppressed Appellant's statements during his first interrogation for violation of his Article 31(b) rights. The military judge further found that Appellant's statement during his second interrogation that "I think I'd better stay silent on this one, no reason to drag other people into this," was an unequivocal invocation of his right to remain silent.[11] The military judge concluded that asking for the phone's passcode after this invocation violated Appellant's Fifth Amendment right against self-incrimination. However, he concluded that even without using the passcode that was unlawfully obtained from Appellant, the NCIS agents would have inevitably discovered the evidence on Appellant's phone, and on this basis he denied the motion to suppress its contents.

Appellant asserts the military judge abused his discretion by concluding that the evidence on Appellant's cellphone was subject to inevitable discovery.[12] "We review a military judge's ruling on a motion to suppress for an abuse of discretion and consider the evidence in the light most favorable to the party that prevailed at trial."[13] "A military judge abuses his discretion if his findings

---

[10] Pros. Ex. 3 at 12, 15.

[11] App. Ex. XIII(a) at 12. While it is possible to interpret Appellant's statement as a refusal only to answer a particular line of questioning rather than a desire to terminate the interview, we assume no error in this aspect of the military judge's ruling, which the Government does not dispute.

[12] Appellant conceded at trial that there was probable cause to seize and search the phone.

[13] *United States v. Mitchell*, 76 M.J. 413, 417 (C.A.A.F. 2017) (internal citation omitted).

of fact are clearly erroneous or his conclusions of law are incorrect."[14] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[15]

The Fifth Amendment states, "No person . . . shall be compelled in any criminal case to be a witness against himself."[16] Article 31, UCMJ, provides similar protection against compulsory self-incrimination.[17] To qualify for such protection, a communication "must be testimonial, incriminating, and compelled."[18] "To be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information."[19] Our superior court has held that asking a suspect to state a cellphone's passcode for purposes of executing a search authorization for its contents constitutes an interrogation—i.e., questioning reasonably likely to elicit an incriminating response—since the "response constitutes an implicit statement that he own[s] the phone and kn[ows] the passcode for it."[20] Questioning must cease if a person invokes his right against self-incrimination to terminate the interview.[21] Thus, once such an invocation of rights has occurred, the Fifth Amendment does not permit "asking a suspect to unlock his phone when the device [is being] seized pursuant to a valid search and seizure authorization."[22]

While evidence obtained through the violation of such rights is generally inadmissible, an exception to this rule of exclusion is "when the evidence would

---

[14] *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015) (internal quotation marks and citation omitted).

[15] *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (internal quotation marks and citation omitted).

[16] U.S. Const. amend. V.

[17] 10 U.S.C. § 831; *United States v. Williams*, 23 M.J. 362, 366 (C.M.A. 1987); Mil. R. Evid. 305(c)(1).

[18] *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 189 (2004).

[19] *Id.*

[20] *Mitchell*, 76 M.J. at 418.

[21] Mil. R. Evid. 305(c)(4).

[22] *United States v. Robinson*, 77 M.J. 303, 308 n.4 (C.A.A.F. 2018) (quoting *Mitchell*, 76 M.J. at 415). While *Mitchell* involved a violation of the Fifth Amendment right to counsel, we find its reasoning equally applicable to a violation of the Fifth Amendment privilege against self-incrimination.

have been obtained even if the [unlawfully obtained] statement had not been made."[23] In order to qualify for this exception, the government must demonstrate "by a preponderance of the evidence that when the illegality occurred, the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence in a lawful manner."[24] "Mere speculation and conjecture as to the inevitable discovery of the evidence is not sufficient."[25] Rather, the exception is "only applicable '[w]hen the *routine procedures of a law enforcement agency* would inevitably find the same evidence.'"[26]

The issue of what constitutes a "routine" law enforcement procedure for purposes of inevitable discovery has been analyzed by reference to the evidentiary rules regarding organizational routine practices.[27] The case precedent in this area holds that "[t]here is no precise formula for determining when a practice becomes so consistent as to rise to the level of routine, but it is now settled that 'adequacy of sampling and uniformity of response' are controlling considerations."[28] "These factors focus on whether the behavior at issue 'occurred with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances.'"[29]

Our superior court has addressed the issue by focusing on the "reasonable likelihood" that law enforcement would discover the evidence through then-

---

[23] Mil. R. Evid. 304(b)(3); *see also* Mil. R. Evid. 311(c)(2).

[24] *United States v. Wicks*, 73 M.J. 93, 103 (C.A.A.F. 2014) (internal quotation marks and citations omitted).

[25] *Id.* (internal quotation marks and citation omitted).

[26] *Id.* (quoting *United States v. Owens*, 51 M.J. 204, 204 (C.A.A.F. 1999)) (emphasis added).

[27] *See United States v. Milikan*, 404 F. Supp. 2d 924, 931-32 (E.D. Tex. 2005) (applying Fed. R. Evid. 406, similar to Mil. R. Evid. 406, to inevitable-discovery analysis); Mil. R. Evid. 406 ("Evidence of a person's habit or *an organization's routine practice* may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice.") (emphasis added).

[28] *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1533 (11th Cir. 1985) (quoting *Reyes v. Missouri Pacific Railroad*, 589 F.2d 791, 795 (5th Cir. 1979)).

[29] *United States v. Newman*, 982 F.2d 665, 668 (1st Cir. 1992) (quoting *Weil v. Seltzer*, 873 F.2d 1453, 1460 (D.C. Cir. 1989)).

existing means and methods.[30] The court has applied inevitable discovery where the search of a suspect's automobile was unlawful due to a lack of voluntary consent, but there was strong evidence to establish probable cause and "no reasonable likelihood that [the police officer] would have abandoned his efforts to search the automobile."[31] Inevitable discovery has also been applied where a search authorization failed to authorize the search of certain bags discussed in the supporting affidavit, but the court found the law enforcement agents (1) would have gotten the authorization modified to cover the search of the bags "had they recognized the discrepancy," and (2) "were actively pursuing leads that would have led them to the same evidence."[32]

On the other hand, the court found discovery of a cellphone's contents was not inevitable where law enforcement unlawfully obtained the phone's passcode after a rights invocation, but the government "did not even learn about the [alternative] possibility of fingerprint access" to the phone until "over fifteen months after the offending interrogation," and "the record disclose[d] no guarantee that this procedure would have succeeded."[33] Noting there was no evidence that the phone's fingerprint-access feature was enabled at the time the passcode was unlawfully obtained, the court concluded the government's ability to access the phone's contents was speculative.[34]

Here, the military judge concluded that NCIS would inevitably have been able to unlock, search, and obtain the evidence from Appellant's iPhone 6 even without using the unlawfully obtained passcode, by bypassing the phone's security. Based on testimony and evidence relating to its seizure, the military judge found that the phone was turned on and had an 81% battery charge when it was obtained from Appellant's locker. Reasoning that most people leave their cellphones powered on when not using them, he found that the phone was in the condition of "after first unlock" when seized, meaning its passcode had been successfully entered at least once without powering off.[35] He found that at the time the phone was seized, NCIS possessed and used a program called "GrayKey," which was "2 for 2" in bypassing cellphone passcodes within 17

---

[30] *See Owens*, 51 M.J. at 210.

[31] *Id.*

[32] *United States v. Eppes*, 77 M.J. 339, 348 (C.A.A.F. 2018).

[33] *Mitchell*, 76 M.J. at 416, 420 (citations omitted).

[34] *Id.* at 420.

[35] App. Ex. XIII(a) at 13; R. at 99.

days for cellphones like the iPhone 6 that had not lost power after first un-lock.[36] He found this success rate was "attributed to the agents (1) seizing the phone; (2) ensuring the phone is charged; and (3) overnighting the phone to [the NCIS digital forensic examination] team's facility in Washington D.C. for extraction."[37] He found that this evidence demonstrated "an NCIS routine, al-beit a recent one, of an ability to unlock an iPhone 6."[38]

We find no abuse of discretion in the military judge's ruling that the evi-dence obtained from Appellant's phone would have been inevitably discovered, for two reasons. First, while Appellant takes issue with the military judge's factual finding that Appellant's phone was in a condition of "after first unlock" when it was seized, we find this to be a reasonable inference drawn from the evidence and not clearly erroneous. Second, we find sufficient evidentiary sup-port for the military judge's finding that the use of GrayKey to unlock cellphone passcodes was a "routine procedure" of NCIS at the time Appellant's passcode and phone were obtained on 16 May 2019.

Whether a routine law enforcement practice exists is a question of fact, which is reviewed for clear error.[39] Although the evidence supports that NCIS successfully used GrayKey to unlock older cellphones like the iPhone 6 on two occasions over the 14-month period between its implementation on 2 April 2019 and the motions hearing on 30 June 2020, the record is silent as to whether either of those successful uses occurred during the month and a half between when GrayKey was implemented and the day Appellant's passcode and phone were obtained on 16 May 2019. However, we are persuaded that in determining whether a routine exists, evidence of an organization's practices both before and after the incident in question is relevant to the analysis.[40]

---

[36] App. Ex. XIII(a) at 13. The NCIS digital forensic examiner testified that if its condition were "before first unlock," unlocking an iPhone 6 would have to be done through a brute force attack, which could take up to 17 years. R. at 47, 49.

[37] App. Ex. XIII(a) at 13.

[38] *Id.*

[39] *See Meyer v. United States*, 638 F.2d 155, 158 (10th Cir. 1980) (finding that evi-dence of habit/routine is weighed "in the same manner that any other evidence would be weighed" and in this regard any "[c]onflicting evidence raises an issue of fact" which is reviewed for clear error).

[40] *See Commonwealth of Pennsylvania v. Porter*, 659 F.2d 306, 320 (3d Cir. 1981) (finding that in action by state brought to enjoin police from violating citizens' civil rights, violations before limitations period and after filing of suit were relevant to show pattern or routine practice of defendant).

Hence, we do not find the military judge's finding of a "recent" routine to use GrayKey to unlock cellphones such as Appellant's to be clearly erroneous.

Appellant argues that even if a routine practice of the use of GrayKey by NCIS was established, the evidence does not support that the NCIS field agents investigating Appellant's case knew of the GrayKey protocols and would have followed them. Case law construing evidentiary rules regarding organizational routine practice supports the view that the evidence must establish that the particular individuals involved would have followed the routine.[41] And in *United States v. Mitchell*, where the government argued that military investigators could have compelled the accused to unlock his iPhone with his fingerprint, our superior court concluded that the government's ability to access the phone's contents was speculative since, among other things, "[n]either investigator knew at the time [the accused's passcode was unlawfully obtained] that [his] iPhone had two finger/thumb prints stored, and could have potentially been opened using 'Touch ID capabilities.'"[42]

However, the court in *Mitchell* also noted that the government in that case "[did] not argue that a digital forensic examiner could have bypassed [the accused's] security,"[43] which is precisely what the NCIS digital forensic examiner testified to here. While testimony was not elicited from the investigating agent regarding his knowledge of GrayKey and its protocols, which would have strengthened the Government's argument, we nevertheless find no reasonable likelihood that the agent would have abandoned his efforts to search the phone. Thus, we do not find clearly erroneous the military judge's implicit factual inference that the agent would have followed the process described by the NCIS digital forensic examiner in submitting the phone to the digital forensic examination team's facility, to be unlocked with GrayKey, in the event Appellant refused to provide his passcode.

Accordingly, we find no error in the denial of Appellant's suppression motion on grounds of inevitable discovery.

---

[41] *See Newman*, 982 F.2d at 669 ("[W]e are aware of no case, and appellant cites none, in which the routine practice of an organization, without more, has been considered probative of the conduct of a particular individual within the organization.") (citing *United States v. Angelilli*, 660 F.2d 23, 41 (2d Cir. 1981), *cert. denied*, 455 U.S. 910 (1982)).

[42] *Mitchell*, 76 M.J. at 416.

[43] *Id.* at 420 n.8.

## B. Legal and Factual Sufficiency

Appellant asserts that the evidence is not legally and factually sufficient to prove that he communicated a threat to Ms. Charlie. We review legal and factual sufficiency de novo.[44]

In determining legal sufficiency, we must ask ourselves if, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[45] In doing so, we "draw every reasonable inference from the evidence of record in favor of the prosecution."[46] In determining factual sufficiency, we must be convinced of an appellant's guilt beyond a reasonable doubt after weighing the evidence in the record of trial and making allowances for not having observed the witnesses.[47] In doing so, we do not presume either innocence or guilt, and instead take "a fresh, impartial look at the evidence" to independently determine whether each element has been satisfied with proof beyond a reasonable doubt.[48] Proof beyond a reasonable doubt, however, "does not mean the evidence must be free from conflict."[49]

### 1. Communicating a Threat

In order to sustain the conviction for communicating a threat in violation of Article 115, UCMJ, as charged, the Government must have proven beyond a reasonable doubt: (1) that Appellant communicated certain language expressing a present determination or intent to kill Ms. Charlie presently or in the future; (2) that he communicated this language to Ms. Charlie; and (3) that the communication was wrongful.[50] The offense thus has both objective and

---

[44] Article 66(d), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[45] *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[46] *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015).

[47] *Turner*, 25 M.J. at 325.

[48] *Washington*, 57 M.J. at 399.

[49] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citation omitted).

[50] *Manual for Courts-Martial, United States* (2019 ed.) [*MCM*], pt. IV, para. 53.b.

subjective prongs, which "speak to the requirements of two different elements of a single offense."[51]

First, "the existence of a threat should be evaluated from the point of view of a reasonable person."[52] "The communication must be one that a reasonable person would understand as expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future"; however, "[p]roof that the accused actually intended to kill, injure, intimidate, damage or destroy is not required."[53] In other words, this element focuses on identifying "a declaration of intent" in objectively determining "whether the communication was indeed threatening," for which "subjectivity is of no bearing."[54] We find that Appellant's statement to the other Sailors that he was "going to kill the b[***]"—made in obvious reference to Ms. Charlie after she went upstairs—satisfies this objective first element. Irrespective of whether he actually intended to kill Ms. Charlie, a reasonable person would understand this statement as expressing a present determination to wrongfully injure her presently or in the future.

The element of wrongfulness, on the other hand, requires subjective intent.[55] "[This] mental state requirement is satisfied if the accused transmitted the communication for the purpose of issuing a threat or with knowledge that the communication will be viewed as a threat.[56] By contrast, "[a] statement made under circumstances that reveal it to be in jest or for an innocent or legitimate purpose that contradicts the expressed intent to commit the act is not wrongful."[57] As our superior court has explained,

---

[51] *United States v. Rapert*, 75 M.J. 164, 168 (C.A.A.F. 2016) (internal citations and italics omitted).

[52] *Id.* (internal quotation marks and citations omitted).

[53] *MCM*, pt. IV, para. 53.c.(1).

[54] *Rapert*, 75 M.J. at 169.

[55] *Rapert*, 75 M.J. at 168; *see also Elonis v. United States*, 575 U.S. 723, 734 (2015) (stating that "[t]he central thought is that a defendant must be blameworthy in mind before he can be found guilty, a concept courts have expressed over time through various terms such as mens rea, scienter, malice aforethought, guilty knowledge, and the like") (internal quotation marks and citations omitted).

[56] *MCM*, pt. IV, para. 53.c.(2).

[57] *Id.*

> The . . . requirement that the Government prove that an ac-
> cused's statement was wrongful because it was not made in jest
> or as idle banter . . . prevents the criminalization of otherwise
> "innocent conduct," and thus requires the Government to prove
> the accused's mens rea rather than base a conviction on mere
> negligence.[58]

Determining this element requires an assessment of the surrounding circum-
stances.[59]

Here, the only person who testified to actually hearing the statement at
issue was FA Victor. He testified that Appellant made the statement to FN
Juniper and himself, not to Ms. Charlie, and only after Ms. Charlie had gone
upstairs. He further testified that he did not take the comment seriously be-
cause of Appellant's drunken state. While Ms. Charlie testified that an angry
Appellant chased her out of the room and caused her to run upstairs and lock
herself in a different room, she did not testify about what, if any, threatening
statement he made to her at that time. This issue was not lost on the members,
who during deliberations submitted a question to the military judge asking,
"Did the threat to [Ms. Charlie] have to come directly from the Accused to [Ms.
Charlie]? Could the threat to her life come to her via a third party and meet
the requirements of the charge?"[60] In response, the military judge properly in-
structed them that

> the Government has charged specifically that the accused com-
> municated certain language to her directly, to wit, a threat to
> kill her and that the communication was made known to her. So,
> in this instance, to answer your question, did the threat to [Ms.
> Charlie] have to come directly from the accused to [Ms. Charlie],
> according to the way the Government has charged it, the answer
> is yes.[61]

Thus, as the Government conceded at oral argument, the only statement at
issue is the one Appellant made to FA Victor after Ms. Charlie left the room.

---

[58] *Rapert*, 75 M.J. at 169.

[59] *See United States v. Gilluly*, 32 C.M.R. 458, 461 (C.M.A. 1963) ("[A] declarant's
true intention . . . and the surrounding circumstances may so belie or contradict the
language of the declaration as to reveal is to be a mere jest or idle banter.").

[60] App. Ex. XXX(b).

[61] R. at 974.

*2. Fatal Variance*

Appellant argues there is a fatal variance between the specification charging him with communicating a threat directly to Ms. Charlie and the evidence supporting that his communication was to a third party when she was no longer present. "Whether there was a fatal variance is a question of law reviewed de novo."[62] "[T]o prevail on a fatal variance claim, an appellant must show both [1] that the variance was material and [2] that he was substantially prejudiced thereby."[63]

A variance is material if it involves "an integral part of an element of the offense."[64] This determination must focus not only on the required statutory elements, but also on the conduct alleged in the specification. As our superior court has explained,

> It is fundamental . . . that the allegation of criminality and proof must correspond; that regardless of what is disclosed by the evidence, proof, in order to be effectual, must correspond substantially with the allegations of the pleadings. If they are not thus proved, a variance or failure of proof, dependent upon the scope and meaning of the allegation, results.[65]

The *Manual for Courts-Martial* provides that a threat can be made either to a victim directly or to a third party.[66] However, we agree with our sister court that "if the specification charging the offense alleges that the words were communicated to the person threatened, while the proof shows that they were spoken to another person and never communicated to the putative victim, we have a variance between the pleadings and the proof that becomes material."[67]

The Government argues the evidence circumstantially supports that Ms. Charlie overheard the Appellant's statement to the other Sailors, based on her two out-of-court statements that were admitted at trial: (1) FN Juniper's vague recollection that Ms. Charlie later told him Appellant had "threatened

---

[62] *United States v. Treat*, 73 M.J. 331, 335 (C.A.A.F. 2014) (citations omitted).

[63] *United States v. Marshall*, 67 M.J. 418, 420 (C.A.A.F. 2009).

[64] *Treat*, 73 M.J. at 336.

[65] *United States v. Dotson*, 17 C.M.A. 352, 354, 38 C.M.R. 150, 152 (1968).

[66] *MCM*, pt. IV, para. 53.b.(1)(b).

[67] *United States v. Gray*, 40 C.M.R. 982, 986 (C.G.C.M.R. 1969) (citations omitted).

her,"[68] and (2) the note she subsequently gave to law enforcement, stating, "I am scared, not just for my safety but my life. A man I have been off and on with told me he wanted to kill me."[69] Neither of these statements convinces us that Ms. Charlie heard Appellant communicate a threat to FA Victor.

Proof beyond a reasonable doubt "must be such as to exclude . . . every fair and rational hypothesis except that of guilt."[70] Here, two equally fair and rational hypotheses that do not point to guilt are (1) that instead of overhearing Appellant's statement to FA Victor, Ms. Charlie was referring to some other statement that she heard or learned about from a third party,[71] and (2) that even if she did overhear Appellant's statement after leaving the room, Appellant did not intend for her to overhear it, but said it merely in jest or idle bravado to the other Sailors.[72] Thus, in our view the evidence supporting Appellant's conviction, at best, presents a material variance in that the alleged threat was communicated to FA Victor, not to Ms. Charlie as charged.

We therefore assess the variance for substantial prejudice. "A variance can prejudice an appellant by (1) putting him at risk of another prosecution for the same conduct, (2) misleading him to the extent that he has been unable adequately to prepare for trial, or (3) denying him the opportunity to defend against the charge."[73] For the last prong, we "look[ ] closely at the specifics of

---

[68] R. at 697, admitted as a prior consistent statement to rehabilitate Ms. Charlie's credibility under Mil. R. Evid. 801(d)(1)(B)(ii).

[69] Pros. Ex. 1, admitted as a statement of Ms. Charlie's then-existing mental or emotional condition under Mil. R. Evid. 803(3). R. at 608.

[70] *United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994).

[71] FA Victor did not testify that, upon hearing the statement at issue, he communicated it to Ms. Charlie. *See Gray*, 40 C.M.R. at 986 (finding the evidence did not support that the third party to whom the threatening statement was made communicated that particular statement to the victim alleged in the specification).

[72] *Cf. United States v. Hall*, 52 M.J. 806, 807 (N-M. Ct. Crim. App. 2000) (affirming conviction for communicating a threat where after a confrontation the appellant was pacing within view and earshot of the victim while looking over at him, said to other Marines loudly enough for the victim to hear, "[h]e don't know how bad I want to shoot him," then retrieved a pistol from his barracks room, placed it in the small of his own back, and continued to pace angrily around looking at the victim).

[73] *Treat*, 73 M.J. at 336 (internal quotation marks and citations omitted).

the defense's trial strategy . . . [and] consider how the defense channeled its efforts and what defense counsel focused on or highlighted."[74]

In this case, the Defense channeled significant effort into disproving that the statement was made directly to Ms. Charlie, as charged, as a means of disproving that Appellant made the statement for the purpose of issuing a threat to Ms. Charlie or with knowledge that the communication would be viewed as a threat. On its motion to dismiss the charge under R.C.M. 917, in response to the Government's position that the threat could be communicated either to Ms. Charlie or to a third party, the Defense responded that "communicating a threat to a third party is a separate offense and it would be a major variance at this point."[75] During its closing argument, the Defense argued,

> [FA Victor] said that he heard EM3 Taylor say "I'm going to kill her" or "I'm going to kill that b[***]," something along those lines. But, Members, think about this, right. [Appellant] told that, according to [FA Victor] to [FA Victor], after [Ms. Charlie] ran upstairs. *[Ms. Charlie] wasn't even in the room when [Appellant] said that.* And, in addition, right, in addition, [FA Victor] told you he didn't take it seriously. He did not take the statement by [Appellant] seriously.[76]

In this context, were we to affirm Appellant's conviction based on evidence that Appellant communicated the alleged threat to a third party, as opposed to Ms. Charlie as charged, the Defense's efforts at trial would be undermined. As this would effectively deprive Appellant of the defense he presented to the charge the Government chose to prefer, we find he would be substantially prejudiced by the variance. We therefore find the variance not only material, but fatal.

Accordingly, we find the evidence factually insufficient to sustain Appellant's conviction for communicating a threat to Ms. Charlie. We set aside those guilty findings in our decretal paragraph below.

## C. Sentence Reassessment

Having set aside one of Appellant's convictions, we must determine whether we can reassess the sentence at the appellate level or whether we must remand for the trial court to do so. We do so by determining: (1) whether there have been dramatic changes in the penalty landscape or exposure;

---

[74] *Id.* (citations omitted)

[75] R. at 828.

[76] R. at 947–48 (emphasis added).

(2) whether sentencing was by members or a military judge alone; (3) whether the nature of the remaining offenses captures the gravamen of the criminal conduct included within the original offenses and whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses; and (4) whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.[77]

Here, we determine that we can reassess the sentence. We need not reassess his term of confinement since the 60 days he received for communicating a threat is less than the concurrent confinement terms he received for the drug-related offenses, which range from 3 to 24 months. With respect to the adjudged reduction and punitive discharge, we find that the nature of the remaining offenses captures the gravamen of his criminal conduct and does not significantly alter the circumstances of the offenses relevant to sentencing. In addition, the remaining offenses are of the type with which appellate judges have experience to reliably determine what sentence would have been imposed at trial. Under these circumstances, we are confident that the sentence the military judge would have imposed for the remaining offenses would include both reduction to E-1 and a bad-conduct discharge, as originally adjudicated.

### D. Sentence Appropriateness

Article 66(c), UCMJ, imposes two duties on military courts of criminal appeals: to ensure the sentence is "correct in law" and that the imposed sentence "should be approved."[78] We make these determinations on the basis of the entire record.[79] "Generally, sentence appropriateness should be judged by individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender."[80] We are only required to consider other court-martial sentences "in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases."[81]

Here, Appellant's drug enterprise spanned multiple commands and involved the intended distribution of LSD to other servicemembers by creating

---

[77] *United States v. Winckelmann*, 73 M.J. 11, 15–16 (C.A.A.F. 2013).

[78] *United States v. Guinn*, 81 M.J. 195, 199 (C.A.A.F. 2021).

[79] *United States v. Jessie*, 79 M.J. 437 (C.A.A.F. 2020).

[80] *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982).

[81] *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001) (quotation and citation omitted).

demand through initially giving out LSD for free and then selling LSD to those same individuals later on. He solicited another Sailor to provide him with psilocybin mushrooms in exchange for receiving LSD from him at cost. The four drug-related offenses of which he was ultimately convicted carry a maximum sentence that includes decades of confinement and a dishonorable discharge. The sentence Appellant received—reduction to E-1, confinement for 24 months, and a bad-conduct discharge—is significantly lower than this maximum authorized sentence.

We find that Appellant's sentence was judged with individualized consideration based on both the nature and seriousness of his offenses and Appellant's character. After reviewing the record as a whole, we find the sentence to be correct in law, that it appropriately reflects the matters in extenuation, mitigation, and aggravation presented, and that it should be approved.

## III. CONCLUSION

The findings of guilty for Charge VII and its sole specification are **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The remaining findings and the sentence are **AFFIRMED**.

Judges STEWART and MYERS concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court